Filed 11/14/16

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C072545 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F3900) |
| v. | |
| ARTHUR LEE PERKINS, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Shasta County, Bradley L. Boeckman, Judge. Reversed in part and affirmed in part.

Joseph Shipp, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Peter H. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

_____

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II, III, V, VI, VII, and VIII.

1

Defendant appeals his convictions arising from the kidnapping and rape of a 17-year-old girl and the rape and sodomy of his 11-year-old former stepdaughter.  He attacks (1) his one-strike sentences on his sex crimes on numerous grounds; (2) the joinder of the two cases; (3) the trial court's denial of his motion to suppress DNA evidence; (4) the lack of instructions on his out-of-court admissions; (5) the lack of a *Marsden*[1] hearing; and (6) cumulative error.  He also seeks a stay of one of his sentences and corrections to the abstract of judgment.

We reverse the life without parole sentences imposed as enhancements under the one-strike rule for lack of substantial evidence.  We affirm the judgment in all other respects and remand the matter for resentencing only.

FACTS

*Victim A. – July 10, 2008*

On the evening of July 10, 2008, 17-year-old A. went to a party.  She wore a new blue dress her grandmother gave her that day.  She was intoxicated when she arrived at the party, and she continued to drink alcohol while she was there.  A friend arrived at the party with defendant.  The friend introduced defendant to A. as JR, a friend of her father's.

About a month before, A. broke her jaw.  On the night of the party, her jaw was wired almost completely shut.  She could open her jaw only about an inch or so.

A. was uncomfortable at the party.  Her ex-boyfriend was there with another girl.  Defendant and A. sat on a couch and talked.  He tried to comfort her.  A. was not attracted to defendant.  He was 36 years old, about 300 pounds in weight, and intimidating in looks.[2]

---

[1]    *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

[2]    Defendant was born January 31, 1972.  He is six feet, five inches tall, and at the time of trial he weighed 250 pounds.

2

At approximately 1:00 a.m., A. left the party and began walking to the nearby home of a friend, where she hoped to spend the night. Although there were a few street lamps, businesses were closed, and it was dark. She saw some people walking on the street at a distance. After she walked across a set of train tracks, someone came up from behind her and punched her in the face, knocking her out.

When A. regained consciousness, she was in pain. Her back hurt from being dragged, and her face hurt from being hit. She had blood on her lips. She was on her back on the ground next to a small wall by an automotive shop some 500 to 600 feet from where she had been hit. The first thing she saw was defendant's face.

Defendant was on top of A. trying to have sexual intercourse with her. Her underwear had been removed. A. screamed, but defendant put his hands on her throat and told her to "shut the fuck up" or he would kill her and her family. She tried to get away, but defendant dragged her back, telling her he would kill her if she tried to escape.

A. eventually "gave up" because she was not going to fight someone who said he would kill her and her family. Defendant penetrated A., but not fully because she was menstruating and was using a tampon. Defendant also orally copulated her. He told her she had better say she liked it. He said if she screamed, he would kill her.

Defendant became frustrated when he could not penetrate A. He sat down next to the wall and told A. to orally copulate him. She told him her mouth was wired shut and she could not do it. He told her to do it or he would kill her. She complied with his demand. Afterward, he took all of her belongings and ran away.

Law enforcement investigated the crime. Photographs of A.'s injuries depicted bruising on the inside of her right bicep, consistent with her being held down. She also had fresh abrasions on her lower back and elbows, and swelling in her face. DNA recovered from semen stains on A.'s dress matched defendant's DNA profile.

A. identified defendant as the person who raped her in a police photographic lineup, and by a tattoo on his leg. She also identified defendant in court as the culprit.

3

*Victim T. – July 8-9, 2011*

On July 8, 2011, 11-year-old T. spent the night at her mother's new apartment. With her that night in the apartment were her mother, C.H. (mother); her sisters M., aged eight, and three-week-old J.; and defendant. T. knew defendant as JR. Defendant was J.'s father, but not T.'s. Although mother and defendant were no longer married, mother asked defendant to help her move into the apartment.

The apartment had one bedroom. T. and M. slept on couches in the living room. That night, mother and defendant argued for hours near the living room. T. thought they stopped arguing around 4:00 a.m. when she went to bed. She did not go to bed earlier because she was making sure M. and J. were all right.

T. awoke early to defendant shaking her. He told her to go feed J. T. went into the bedroom, where J. was lying on the bed, and she gave her a bottle. Mother was not there; defendant told T. her mother had left to pick up things from her old apartment.

Defendant then told T. to go into the bathroom. She thought he told her to go into the bathroom because maybe she was going to help him fix something. She did not want to, or need to, go into the bathroom.

Defendant followed T. into the bathroom, and he began to undo his belt. T. thought he was going to spank her, but she did not know what she had done wrong. Defendant told her to bend down. She bent over at her waist and put her hands on the bathtub. At that point, she thought defendant was trying to do something "creepy." He pulled down her shorts and underwear, and then he pulled down his pants. T. did not try to get out of the bathroom at that point because she was frightened.

Defendant sodomized T. She saw him put cream on his penis. He penetrated her but not completely. It hurt her. T. tried to yell for help, but defendant put his hands around her throat and told her that if she yelled, he would hurt her. She did not try to get away because she feared he would do something. Defendant sodomized her for at least three minutes.

4

Defendant then told T. to go back into the bedroom. She did not want to go into the bedroom, thinking defendant would "do more stuff" there. She did not want to be anywhere near him, but she went into the bedroom because he told her to, and she was afraid that if she did not comply, he would hurt her.

Defendant told T. to get down on her knees on the floor. T. complied. She did not try to run out of the room and go to her sister M. She feared that if she woke up M., defendant would kill her or hurt her. She was concerned about her sisters because defendant said if she told anybody, he was going to hurt baby J. and kill her mom, her father, and M.

Defendant again pulled T.'s underwear down and sodomized her. Only part of his penis penetrated her. It hurt her. This lasted for about three or four minutes. Then defendant turned T. over on her back and had sexual intercourse with her, inserting his penis partway into her vagina. He asked her if it felt good. She said no, it hurt.

T. told defendant she had to go to the bathroom. He told her to go. She used the bathroom, and afterward went into the living room. Defendant came into the living room, held a butter knife to T.'s neck, and said if she ever told anyone, "you know what I was going to do."

Some minutes later, mother returned to the apartment. Mother had left the apartment earlier to get coffee. On her return, she did not want to have another argument, so she sat in her car, drank her coffee, and had "a moment of peace for my own head." She had been gone about 30 or 45 minutes when defendant called her, wanting to know where she was. He said T. had awakened and was "freaking out" thinking her mother was not coming back. So mother went into the apartment. She talked with defendant in the bedroom, and during the conversation, he stuck a knife in the ceiling.

Back in the living room, T. asked her mother if she could go to her father's house. Mother asked why. With defendant standing nearby, T. said, "I can't tell you anything because he'll hurt you. He'll hurt us." Mother reassured T., and eventually T. told her

what happened. Mother checked T.'s genital area in the bathroom, and noticed redness, irritation, and discharge. Enraged, mother attacked defendant, choking him until he turned blue and fell to the ground. She told T. to call 911, and as defendant got up, mother threw him against the kitchen cupboards. Defendant ran out, and mother got the girls into her car to take T. to the hospital. Later, upon returning to the apartment, mother found all of her kitchen knives had been wrapped in a towel and placed behind her dresser in the bedroom.

Police arrived at the apartment complex and found defendant attempting to leave on foot. The police officers repeatedly demanded defendant to stop and place his hands up, but he refused and continued walking toward them. He reached into his front pants pocket and pulled out a knife in a sheath. He threw it against a building. The officers drew their guns, defendant stopped, and the officers arrested him. Officers found a Methadone pill in defendant's possession. The knife had a finger hole in it for better grip.

Police processed the apartment for evidence. The bathroom was visible from the living room. The bathroom door was about 10 feet from the bedroom door, and the bathtub in the bathroom was approximately 30 feet from the bed in the bedroom. The bathtub was a bathtub-shower combination enclosed by three walls. The bathroom medicine cabinet was open, and officers found a bottle of Baby Magic baby lotion on the bottom shelf. Officers also found latent palm prints on the bathtub's outside edge and latent fingerprints on the tub's inside edge. It was not possible to determine when the prints were left, but one print matched T.'s right index finger.

Police swabbed defendant's mouth and penis for DNA analysis. Prior to the exam, defendant was nervous and sweating profusely. He also vomited inside a wastebasket in the interview room.

A hospital nurse examined T. The nurse took swabs of T.'s groin, genitalia, and anal area for DNA analysis. She found redness and an abrasion in the perianal area. T. complained of discomfort in her neck and pain in the vaginal area.

Criminalists analyzed the swabs. They detected the presence of semen on the vaginal and perianal swabs taken from T. DNA recovered from T.'s vaginal swab matched defendant's DNA profile. DNA recovered from defendant's penile swabs matched T.'s DNA profile.

PROCEDURAL HISTORY

Defendant waived his presence at trial except when required for identification purposes. A jury convicted him on 13 counts. Counts 1 through 11 are for crimes committed against T.:

Count 1: Aggravated rape of a child (Pen. Code, § 269, subd. (a)(1);[3]

Count 3: Forcible lewd act on a child (in the bedroom) (§ 288, subd. (b));

Count 5: Forcible sodomy on a child (in the bathroom) (§ 286, subd. (c)(2)(B));

Count 6: Forcible sodomy on a child (in the bedroom) (§ 286, subd. (c)(2)(B))

Count 7: Criminal threats (§ 422);

Count 8: Dissuade witness by force or threat of force (§ 136.1, subd. (c)(1));

Count 9: Assault with a deadly weapon (§ 245, subd. (a)(1));

Count 10: Possession of a dirk or dagger (former § 12020, subd. (a)(4)); and

Count 11: Possession of controlled substances (Health & Saf. Code, § 11350, subd. (a)).

Counts 12 through 15 are for crimes committed against A.:

Count 12: Forcible rape (§ 261, subd. (a)(2));

Count 13: Kidnap to commit rape (§ 209, subd. (b)(1));

---

[3]     Undesignated section references are to the Penal Code.

Count 14:  Forcible oral copulation (§ 288a, subd. (c)(2)); and

Count 15:  Forcible oral copulation (§ 288a, subd. (c)(2)).

The jury also found true a number of special enhancements.  As to counts 3 and 6 against T., the jury found true allegations that defendant's sex crimes in the bedroom involved both aggravated kidnapping and kidnapping under the so-called one-strike rule. (§ 667.61, subd. (j)(1), (2).)  The jury also found true that as to count 8, defendant used a deadly weapon (former § 12022, subd. (b)), and as to count 12 against A., defendant committed a sex crime against more than one person.  (§ 667.61, subd. (b).)

The information alleged the aggravated kidnapping and kidnapping special enhancements as to count 5 as well as counts 3 and 6, but the jury apparently did not reach a verdict on those allegations as to count 5.  It left the verdict form for them blank.

The information charged two alternative counts.  It charged defendant in count 2, as an alternative to count 5, with a forcible lewd act on a child (touching T.'s anus in the bathroom) (§ 288, subd. (b)), and in count 4, as an alternative to count 6, with another forcible lewd act on a child (touching T.'s anus in the bedroom) (§ 288, subd. (b)).  The information also alleged the aggravated kidnapping and kidnapping special enhancements under the one-strike rule as to both counts 2 and 4.  However, because the jury convicted defendant on counts 5 and 6 (forcible sodomy), the jury, as the court had instructed it, found defendant not guilty of counts 2 and 4.  The jury also left blank the verdict forms for the special enhancements for those counts.

The trial court imposed an aggregate sentence of life without parole, plus a consecutive indeterminate term of 15 years to life and a consecutive determinate term of 37 years.  The court calculated the indeterminate terms as follows:  life without parole on count 3 under the one-strike rule for the aggravated kidnapping enhancement, a concurrent life without parole on count 6 under the same enhancement, a consecutive 15 years to life on count 12 under the multiple victim enhancement, and an indeterminate sentence of life on count 13 but stayed under section 654.  As for determinate terms:  a

8

consecutive term of four years on count 8 plus a consecutive one-year term for the weapons enhancement, a consecutive term of 13 years on count 5, consecutive terms of eight years each on counts 14 and 15, and consecutive one-third the midterm sentences of eight months on count 7, one year on count 9, eight months on count 10, and eight months on count 11.

## DISCUSSION

## I

### *Challenges to Aggravated Kidnapping and Kidnapping Enhancements*

Defendant raises a number of contentions against the aggravated kidnapping and kidnapping enhancement findings that resulted in his life sentences. He claims: (1) substantial evidence does not support the findings; (2) the trial court erred by not giving a unanimity instruction on the enhancements sua sponte; (3) the court erred by not instructing that a reasonable and good faith belief that T. consented to the movements was a defense to aggravated kidnapping and kidnapping; and (4) California law defining the asportation element of aggravated kidnapping and kidnapping is unconstitutionally vague. Defendant also contends his trial counsel rendered ineffective assistance to the extent counsel failed to object and raise these arguments at trial.

We conclude insufficient evidence supports the enhancement findings. The evidence does not establish defendant moved T. a substantial distance and in a manner that substantially increased the risk of harm. We thus reverse the enhancements for kidnapping and aggravated kidnapping. Because of our decision, we do not discuss defendant's other arguments against the kidnapping findings to the extent they relate to T.

" 'In reviewing the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citation.] 'Substantial evidence' is evidence which is ' "reasonable in nature, credible,

9

and of solid value." ' [Citation.]" (*People v. Morgan* (2007) 42 Cal.4th 593, 613-614 (*Morgan*), original italics.)

"To prove a defendant guilty of kidnapping, the prosecution must establish that (1) the defendant took, held, or detained another person by using force or by instilling reasonable fear; (2) using that force or fear, the defendant moved the other person, or made the other person move a substantial distance; and (3) the other person did not consent to the movement." (*People v. Burney* (2009) 47 Cal.4th 203, 232; § 207, subd. (a).) The second element, that the victim be moved a substantial distance, is called the asportation element. (*People v. Bell* (2009) 179 Cal.App.4th 428, 435.)

To prove the aggravated kidnapping enhancement, the prosecution must establish the defendant "kidnapped the victim of the [underlying] offense and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense . . . ." (§ 667.61, subd. (d)(2).) "The plain wording of this enhancement requires two elements: (1) a simple kidnapping (§ 207, subd. (a)); and (2) a substantial increase in the risk of harm to the victim." (*People v. Diaz* (2000) 78 Cal.App.4th 243, 246, fn. omitted (*Diaz*).) In addition, the asportation element of the aggravated kidnapping enhancement "requires movement of the victim that is more than incidental to the underlying sex offense." (*Ibid.*)

At issue here is whether substantial evidence supports the jury's finding that the prosecution established the asportation element of each enhancement beyond a reasonable doubt. The standards for establishing the asportation element of the simple kidnapping enhancement and the aggravated kidnapping enhancement are separate, but they can overlap where, as here, the simple kidnapping involves an associated crime.

To establish asportation for a simple kidnapping, the prosecution must prove the victim's movement was " 'substantial in character.' " (*People v. Martinez* (1999) 20 Cal.4th 225, 235 (*Martinez*), quoting *People v. Stanworth* (1974) 11 Cal.3d 588, 601.) A jury determines whether the movement was substantial in character by considering "the

10

totality of the circumstances.  Thus, in a case where the evidence permitted, the jury might properly consider not only the actual distance the victim is moved, but also such factors as whether that movement increased the risk of harm above that which existed prior to the asportation, decreased the likelihood of detection, and increased both the danger inherent in a victim's foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes." (*Martinez, supra,* 20 Cal.4th at p. 237, fn. omitted.)

"While the jury may consider a victim's increased risk of harm, it may convict of simple kidnapping without finding an increase in harm, or any other contextual factors. Instead, . . . the jury need only find that the victim was moved a distance that was 'substantial in character.'  [Citations.]  To permit consideration of 'the totality of the circumstances' is intended simply to direct attention to the evidence presented in the case, rather than to abstract concepts of distance.  At the same time, we emphasize that contextual factors, whether singly or in combination, will not suffice to establish asportation if the movement is only a very short distance.

"In addition, in a case involving an associated crime, the jury should be instructed to consider whether the distance a victim was moved was incidental to the commission of that crime in determining the movement's substantiality. . . .  [S]uch consideration is relevant to determining whether more than one crime has been committed . . . ." (*Martinez, supra,* 20 Cal.4th at p. 237.)

To establish the asportation element for the aggravated kidnapping enhancement, the prosecution must show (1) the movement was substantial in character, and not merely incidental to the commission of the sex crime (*Diaz, supra,* 78 Cal.App.4th at pp. 245-246), and (2) "the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying" sex

11

offense.  (§ 667.61, subd. (d)(2); *People v. Dominguez* (2006) 39 Cal.4th 1141, 1150 (*Dominguez*).)**4**

Because in this appeal we must review the evidence supporting the related findings that defendant's movement of T. back to the bedroom was not merely incidental to the underlying sex crime and it significantly increased the risk of harm to T., we discuss those elements in detail.  Over the years, appellate courts disagreed on how to determine whether a movement associated with an underlying crime was merely incidental to that crime.  (See *People v. Salazar* (1995) 33 Cal.App.4th 341, 347 [movement was not merely incidental if it was not a necessary or natural part of committing rape]; *People v. Shadden* (2001) 93 Cal.App.4th 164, 168-169 [same]; *People v. Hoard* (2002) 103 Cal.App.4th 599, 605-607 [incidental movements and necessary movements are not the same; rather, incidental movements are subordinate or nonessential]; *People v. Aguilar* (2004) 120 Cal.App.4th 1044, 1051 [movement may be necessary to commit a crime, but incidental to it].)

In *Diaz*, the Court of Appeal, Second Appellate District, described incidental movements as movements that are "brief and insubstantial, and frequently consist of movement around the premises where the incident began."  (*Diaz, supra,* 78 Cal.App.4th at p. 247.)  The Court of Appeal upheld enhancements for simple and aggravated

---

**4**     Since 1997, there is a difference in the asportation standards for the crime of aggravated kidnapping to commit robbery or rape and for aggravated kidnapping alleged as a one-strike enhancement to a sex crime.  The former requires a showing that the movement increased the risk of harm to the victim, while the latter requires a showing that the movement *substantially* increased the risk of harm to the victim.  (*People v. Robertson* (2012) 208 Cal.App.4th 965, 979-982; §§ 209, subd. (b)(2); 667.61, subd. (d)(2).)  Prior to 1997, the asportation standard for the crime of aggravated kidnapping mirrored that for the aggravated kidnapping enhancement.  (*Id*. at p. 979.)  We thus rely on cases, such as *Dominguez*, that concerned the pre-1997 standard for the crime of aggravated kidnapping as well as cases regarding the kidnapping enhancements to guide our review here.

kidnapping to commit a sex crime, finding the defendant's moving the victim 150 feet from a lit bus stop in the early morning hours into a dark park and around to the back side of a large recreation center building was not merely incidental to the crime. (*Id*. at p. 248.)

In *Dominguez*, the Supreme Court addressed the issue. Instead of further defining what "merely incidental" meant, it emphasized that whether a movement was incidental to an underlying crime was determined based on multiple factors, including whether the movement increased the victim's risk of harm. We quote *Dominguez* at length: "Concerned in *People v. Daniels* (1969) 71 Cal.2d 1119 (*Daniels*) that the ' "criminologically nonsignificant circumstance that the victim [of a robbery] was detained or moved *incident to* the crime" ' resulted in a much harsher penalty (*id.* at p. 1138), we held that the Legislature, in creating the crime of aggravated kidnapping (at that time, kidnapping for ransom, reward, extortion or robbery), intended to exclude those situations in which the movement of a robbery victim was 'merely incidental to the commission of the robbery and [did] not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself' (*id.* at p. 1139).

"The crime of aggravated kidnapping was enlarged in 1990 to include kidnapping for enumerated sex crimes. (Stats. 1990, ch. 1560, § 1, p. 7329.) In 1994, we held the *Daniels* test for asportation applied to kidnapping for rape under former section 208(d). (*People v. Rayford* (1994) 9 Cal.4th 1 (*Rayford*).) Thus, 'the standard of asportation for [former] section 208(d) kidnapping requires that the movement of the victim be for a distance which is more than that which is merely incidental to the commission or attempted commission of rape . . . , and that this movement substantially increase the risk of harm to the victim over and above that necessarily present in the commission or attempted commission of these crimes.' (*Id*. at p. 22.) [¶] . . . [¶]

"Whether a forced movement of a rape victim (or intended rape victim) was merely incidental to the rape, and whether the movement substantially increased the risk

of harm to the victim, is difficult to capture in a simple verbal formulation that would apply to all cases. We discussed the standard in *Rayford* and explained that the jury must 'consider[ ] the *"scope and nature"* of the movement,' as well as *"the context of the environment in which the movement occurred.'* (*Rayford, supra,* 9 Cal.4th at p. 12, italics added; see *People v. Aguilar*[, *supra*,] 120 Cal.App.4th [at p.] 1051 [emphasizing the context of the movement].) This standard suggests a multifaceted, qualitative evaluation rather than a simple quantitative assessment. Moreover, whether the victim's forced movement was merely incidental to the rape is necessarily connected to whether it substantially increased the risk to the victim. 'These two aspects are not mutually exclusive, but interrelated.' (*Rayford,* at p. 12.)

"The essence of aggravated kidnapping is the increase in the risk of harm to the victim caused by the forced movement. (*Rayford, supra,* 9 Cal.4th at p. 22.) We have articulated various circumstances the jury should consider, such as whether the movement decreases the likelihood of detection, increases the danger inherent in a victim's foreseeable attempts to escape, or enhances the attacker's opportunity to commit additional crimes. (*Id.* at p. 13.) In finding insufficient evidence of asportation, the [*Dominguez*] Court of Appeal below focused too narrowly on a subsidiary aspect of the analysis, measured distance, rather than considering how all the attendant circumstances related to the ultimate question of increased risk of harm. Although any assessment of the *Daniels/Rayford* test necessarily must include a consideration of the actual distance the victim was forced to move (*Rayford, supra,* 9 Cal.4th at p. 12), we have repeatedly stated no minimum distance is required to satisfy the asportation requirement (*ibid.*), so long as the movement is substantial (*id.* at p. 23).

"Measured distance, therefore, is a relevant factor, but one that must be considered in context, including the nature of the crime and its environment. In some cases a shorter distance may suffice in the presence of other factors, while in others a longer distance, in the absence of other circumstances, may be found insufficient. For example, moving

14

robbery victims between six and 30 feet within their home or apartment (see *Daniels,*
*supra,* 71 Cal.2d at pp. 1123-1124) or 15 feet from the teller area of a bank to its vault
(*People v. Washington* (2005) 127 Cal.App.4th 290, 299) may be viewed as merely
incidental to the commission of the robbery and thus insufficient to satisfy the asportation
requirement of aggravated kidnapping.[5]  Yet, dragging a store clerk nine feet from the
front counter of a store to a small back room for the purpose of raping her (see *People v.*
*Shadden*[, *supra*,] 93 Cal.App.4th [at p.] 167) or forcibly moving a robbery victim 40 feet
within a parking lot into a car (see *People v. Jones* (1999) 75 Cal.App.4th 616, 629)
might, under the circumstances, substantially increase the risk of harm to the victim and
thus satisfy the asportation requirement.  These examples are illustrative only; each case
must be considered in the context of the totality of its circumstances.

"Robberies and sex crimes, the necessary predicates for an aggravated kidnapping
(see § 209), can of course be committed in a variety of ways.  To catalog all the myriad
and various possible aspects of such crimes would be impossible.  But beginning with the
template established in *Daniels, supra,* 71 Cal.2d at 1139, prohibiting increased liability
for aggravated kidnapping for what are essentially brief and trivial movements in
'standstill' robberies or for movements 'merely incidental' to commission of the offense,
through *Rayford, supra,* 9 Cal.4th 1, the applicable test under former section 208(d) is
clear:  for aggravated kidnapping, the victim must be forced to move a *substantial*
*distance,* the movement cannot be merely *incidental* to the target crime, and the
movement must *substantially increase* the risk of harm to the victim.  Application of

---

**5**    On its facts of the victims being moved only from one room to another inside their
apartments, *Daniels* stated:  "[W]hen in the course of a robbery a defendant does no more
than move his victim around inside the premises in which he finds him—whether it be a
residence, as here, or a place of business or other enclosure—his conduct generally will
not be deemed to constitute the offense proscribed by section 209.  Movement across a
room or from one room to another, in short, cannot reasonably be found to be asportation
'into another part of the same county.'  [§ 207.]" (*Daniels, supra,* 71 Cal.2d at p. 1140.)

these factors in any given case will necessarily depend on the particular facts and context of the case." (*Dominguez, supra,* 39 Cal.4th at pp. 1150-1153, fns. omitted, original italics.)

Applying these standards, the *Dominguez* court found sufficient evidence to sustain a verdict of aggravated kidnapping to commit rape. There, the defendant forced the victim in the middle of the night from the side of a public road to a spot in an orchard 25 feet away and 10 to 12 feet below the level of the road. It was unlikely the victim could be seen from the road at that spot, as it was down a steep hill and within an orchard. The movement down an embankment and into an orchard decreased the possibility of detection, escape, or rescue, and was thus not merely incidental to the rape. (*Dominguez, supra,* 39 Cal.4th at pp. 1153-1154.)

More recently, the Supreme Court in *People v. Vines* (2011) 51 Cal.4th 830 (*Vines*), affirmed convictions of aggravated kidnapping to commit robbery under the pre-1997 statute where the movement occurred from room to room inside a business. There, the defendant took a McDonald's restaurant manager at gunpoint past the front counter area of the closed store, back through the cooking area to the safe, and on to the back of the restaurant. Then he ordered the manager and three other employees down into the basement and into the store's freezer, where the temperature was approximately 20 degrees. The defendant shut and locked the freezer door. (*Id*. at pp. 870-871.)

The high court recognized that as in *Daniels*, the movements all occurred inside the business. However, unlike in *Daniels*, the movements took the victims "from the front of the store, down a hidden stairway, and into a locked freezer. Under these circumstances, we cannot say the 'scope and nature' of this movement was 'merely incidental' to the commission of the robbery. Additionally, the movement subjected the victims to a substantially increased risk of harm because of the low temperature in the freezer, the decreased likelihood of detection, and the danger inherent in the victims'

16

foreseeable attempts to escape such an environment." (*Vines, supra,* 51 Cal.4th at p. 871.)

We apply these standards to the facts before us, and conclude defendant's kidnapping and aggravated kidnapping enhancements cannot stand. After sodomizing the victim, defendant ordered her to move from the apartment's only bathroom to the apartment's only bedroom, a distance between only 10 and 30 feet. Substantial evidence does not establish that the movement was not merely incidental to the underlying crime or that it increased the risk of harm.

The movement was for a short distance inside a small private residence from one room to another. We agree with *Daniels'*s observation that movement from one room to another inside a small apartment, without a substantial increase in the risk of harm or other characteristic showing the movement to be a separate crime, does not constitute a movement "into another part of the same county" that is not merely incidental to the underlying sex crime. (§ 207.)

No evidence indicates the movement increased the risk of harm to the victim. There is insufficient evidence showing the movement decreased the likelihood of detection. No evidence showed the doors to either the bathroom or the bedroom were closed during the incidents. There is evidence the bathroom was visible from the living room where T.'s sister was sleeping, but there is no evidence the location in the bathroom where the crimes occurred was visible from the living room. The bathtub was surrounded by three walls, and it is possible the victim was not visible from the living room either by the bathtub or in the bedroom.

There is no evidence showing the movement to the bedroom increased the danger in the victim's foreseeable attempts to escape. With defendant's significant size, it was unlikely the victim could have escaped from him in either the bathroom or the bedroom. The bedroom, assuming it was larger, may have actually given her more of an opportunity.

17

There is also insufficient evidence that moving the victim to the bedroom enhanced defendant's opportunity to commit additional crimes. He had the opportunity to commit whatever crime he wanted in both rooms, and he did. Nothing shows the defendant could not have committed rape in the bathroom.

The Attorney General argues the movement to the bedroom increased the risk of harm because T.'s baby sister was on the bed. Defendant had threatened T. and her family, and the baby was at greater risk of harm from defendant if T. had tried to escape from the bedroom. However, the aggravated kidnapping enhancement applies only if the movement substantially increases the risk of harm "to the victim." (§ 667.61, subd. (d)(2).) The baby was a potential victim, and the risk of harm to her increased when defendant went into the bedroom. But we do not see an increase in the risk of harm to T. by defendant moving her into the bedroom. Indeed, with the defendant's baby daughter present in the bedroom, a person could reasonably conclude T. should have been at less risk there.

The movement was for a short distance inside a private residence from one room to another. The evidence does not establish the movement substantially increased the risk of harm to the victim. We thus cannot find sufficient evidence to support the jury's findings on counts 3 and 6 that the movement was substantial and not incidental for purposes of the kidnapping enhancement, and that the movement was not incidental and substantially increased the risk of harm for purposes of the aggravated kidnapping enhancement. We therefore strike the enhancements and remand the matter to the trial court for resentencing.

II

*Constitutionality of Asportation Standards*

Defendant claims California's asportation standards are unconstitutionally vague and arbitrary. Because we reverse the kidnapping and aggravated kidnapping enhancements, we address this argument only in so far as it relates to defendant's

18

conviction on count 13 of aggravated kidnapping to commit rape against A. (§ 209, subd. (b)(1)). Defendant faults the asportation standards for not providing a fixed minimum distance for determining whether a movement is substantial. He also contends the asportation standards for simple kidnapping when committed with an associated crime and aggravated kidnapping are virtually identical, thereby dissolving the distinction between simple and aggravated kidnapping and resulting in possible arbitrary enforcement. We disagree, as the standards are not vague or arbitrary.

" 'The constitutional interest implicated in questions of statutory vagueness is that no person be deprived of "life, liberty, or property without due process of law," as assured by both the federal Constitution (U.S. Const., Amends. V, XIV) and the California Constitution (Cal. Const., art. I, § 7). Under both Constitutions, due process of law in this context requires two elements: a criminal statute must " 'be definite enough to provide (1) a standard of conduct for those whose activities are proscribed and (2) a standard for police enforcement and for ascertainment of guilt.' " [Citations.]' (*Williams v. Garcetti* (1993) 5 Cal.4th 561, 567.)

"This court has recognized 'the strong presumption that legislative enactments "must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears. [Citations.] A statute . . . cannot be held void for uncertainty if any reasonable and practical construction can be given to its language." ' (*Walker v. Superior Court* (1988) 47 Cal.3d 112, 143.) Therefore, 'a party must do more than identify some instances in which the application of the statute may be uncertain or ambiguous; he must demonstrate that "the law is impermissibly vague in all of its applications." . . . [Citation.]' (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1201.) Stated differently, ' "[a] statute is not void simply because there may be difficulty in determining whether some marginal or hypothetical act is covered by its language." [Citation.]' [Citation.]" (*Morgan, supra,* 42 Cal.4th at pp. 605-606, italics omitted.)

19

The asportation standards are not unconstitutionally vague for not defining a "substantial distance" as a certain distance of feet, yards, or miles. To the contrary, such a definition "would be open to a charge of arbitrariness." (*Daniels, supra,* 71 Cal.2d at p. 1128.) " 'The law is replete with instances in which a person must, at his peril, govern his conduct by such nonmathematical standards as "reasonable," "prudent," "necessary and proper," "substantial," and the like. Indeed, a wide spectrum of human activities is regulated by such terms: thus one man may be given a speeding ticket if he overestimates the "reasonable or prudent" speed to drive his car in the circumstances (Veh. Code, § 22350), while another may be incarcerated in state prison on a conviction of willful homicide if he misjudges the "reasonable" amount of force he may use in repelling an assault [citation]. As the Supreme Court stated in *Go-Bart Importing Co. v. United States* (1931) 282 U.S. 344, 357 [75 L.Ed. 374], "There is no formula for the determination of reasonableness." Yet standards of this kind are not impermissively vague, provided their meaning can be objectively ascertained by reference to common experiences of mankind.' ([*Daniels, supra,*] 71 Cal.2d [at pp.] 1128-1129.)" (*Morgan, supra,* 42 Cal.4th at p. 606.)

Nor are the asportation standards vague or arbitrary due to their similarity. As we explained above, for simple kidnapping with an associated crime, the prosecution must prove the defendant moved the victim a substantial distance, and that the movement was not merely incidental to the underlying crime. While the jury may consider whether the movement increased the victim's risk of harm, and likely will consider that factor when the kidnapping involves an associated crime, it need not make that finding in order to convict of simple kidnapping. (§ 207; *Martinez, supra,* 20 Cal.4th at p. 237.) For the crime of aggravated kidnapping, however, the jury must find that the movement increased the risk of harm. (§ 209, subd. (b)(2).) And for the aggravated kidnapping one-strike enhancement, the jury must find the movement substantially increased the risk of harm. (667.61, subd. (d)(2).) These standards are not vague or arbitrary.

20

*Joint Trial*

Defendant contends the trial court abused its discretion when it consolidated the cases.  He acknowledges the court's action was proper at the time, but he asserts the joinder resulted in gross unfairness amounting to a denial of due process.  He argues a weak case was joined with a strong case, the evidence in the cases was not cross-admissible, the court did not instruct the jury on how to assess cross-admissible evidence, and the two cases were not similar.  We find no abuse of discretion or violation of due process.  The cases were of the same class of cases, and the evidence was cross-admissible.

"The law favors the joinder of counts because such a course of action promotes efficiency."  (*People v. Myles* (2012) 53 Cal.4th 1181, 1200.)  Section 954 provides that "[a]n accusatory pleading may charge two or more different offenses connected together in their commission . . . or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated."

Sex offenses belong to the same class of crimes.  (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1112-1113.)  Thus, as defendant admits, the statutory requirements for joinder were met.

Where the court's joinder was proper at the time it was made, "a reviewing court may reverse a judgment only on a showing that joinder ' "resulted in 'gross unfairness' amounting to a denial of due process." ' (*People v. Mendoza* (2000) 24 Cal.4th 130, 162.)  Even if the court abused its discretion in refusing to sever, reversal is unwarranted unless, to a reasonable probability, defendant would have received a more favorable result in a separate trial.  (*People v. Coffman and Marlow* [(2004)] 34 Cal.4th [1,] 41.)"  (*People v. Avila* (2006) 38 Cal.4th 491, 575.)  In determining whether joinder was an

abuse of discretion, we examine the record before the trial court at the time of its ruling. (*People v. McKinnon* (2011) 52 Cal.4th 610, 630.)

Joinder may be an abuse of discretion where: " '(1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns into a capital case.' " (*People v. McKinnon, supra*, 52 Cal.4th at p. 630.)

" 'Cross-admissibility is the crucial factor affecting prejudice. [Citation.] If evidence of one crime would be admissible in a separate trial of the other crime, prejudice is usually dispelled.' (*People v. Stitely* (2005) 35 Cal.4th 514, 531-532.)" (*People v. Scott* (2015) 61 Cal.4th 363, 395-396.)

The trial court did not abuse its discretion joining the two cases. First, evidence of the crimes was cross-admissible had the cases been separately tried. Evidence of sex crimes is cross-admissible to show propensity. (Evid. Code, § 1108.) Defendant argues no propensity is shown for purposes of section 1108 where the victims, ages, circumstances, and criminal acts are different. However, section 1108 imposes no such prerequisites on sexual propensity evidence. It is enough that the charged offenses are defined in section 1108 (*People v. Frazier* (2001) 89 Cal.App.4th 30, 40-41), as the charges are here (Evid. Code, § 1108, subd. (d)(1)(A)), and that the evidence is not inadmissible under Evidence Code section 352, an argument defendant does not raise here.

Second, neither case was more prejudicial than the other or unusually likely to inflame the jury. In one, defendant knocked out, dragged, threatened, raped, and forced oral copulation by a young woman who had her jaw wired shut. In the other, defendant

choked, sodomized, raped, and threatened with a knife his young stepdaughter in her mother's apartment. Both cases generate strong emotions, but not prejudicially so.

Third, the court did not join a weaker case with a stronger case. Defendant contends A.'s case was weaker than T.'s, and there was potential for spillover prejudice. Actually, both cases were strong. Unchallenged evidence—the victims and witnesses' testimony and DNA evidence—conclusively identified defendant as the culprit in both actions. The compelling evidence in each case stands on its own.

Defendant faults the court for not instructing the jury on how to assess propensity evidence or evidence of similar crimes. The court, however, had no duty to so instruct sua sponte. (*People v. Maury* (2003) 30 Cal.4th 342, 394.) Moreover, defendant failed to request any type of limiting instructions, thereby forfeiting this claim on appeal. (*People v. Valdez* (2012) 55 Cal.4th 82, 149.)

Where, as here, the evidence in the two cases was cross-admissible, neither case was unduly prejudicial, and both cases were strong, the trial court did not abuse its discretion consolidating the cases.

IV

*Motion to Suppress DNA Evidence*

Before trial, defendant moved to suppress the DNA evidence obtained from his penile swabs. Without possessing a search warrant, two law enforcement officers took the swabs the afternoon of defendant's arrest after learning he had raped T. They did this in a private room. Defendant admitted he was on searchable parole and probation at the time, but he contended officers performed the search to harass him and when no exigent circumstances existed. He also claimed the search invaded his dignity. The trial court denied his motion because he was on searchable parole, there was a legitimate investigative purpose for the search, and defendant did not show the search was arbitrary, capricious, or harassing.

23

Defendant contends the trial court erred when it denied his motion to suppress. He argues the search was needless, harassing, unduly invasive, and conducted in an unreasonable manner. He argues the officers, operating under no exigent circumstances, had time to obtain a warrant and medical personnel before taking the swabs. There was no risk to their safety by waiting, and they did not claim the search was incident to arrest. Defendant also contends the court erred by holding him to the burden of proving the search was harassing.

We disagree with defendant's contentions. The search was lawful and reasonable. It was conducted pursuant to a condition of defendant's parole, and the undisputed evidence shows the search was not arbitrary, capricious, or harassing. Also, the court did not impose the burden of proof on defendant.

"A warrantless search is unreasonable under the Fourth Amendment unless it is conducted pursuant to one of the few narrowly drawn exceptions to the constitutional requirement of a warrant. (U.S. Const., 4th Amend.; *Arizona v. Gant* (2009) 556 U.S. 332, 338 [173 L.Ed.2d 485]; [citations].) California's parole search clause is one of those exceptions. (*Samson v. California* (2006) 547 U.S. 843, 846, 850-857 [165 L.Ed.2d 250] (*Samson*).)

"Under California statutory law, every inmate eligible for release on parole 'is subject to search or seizure by a . . . parole officer or other peace officer at any time of the day or night, with or without a search warrant or with or without cause.' (Pen. Code, § 3067, subd. (b)(3).) Upon release, the parolee is notified that '[y]ou and your residence and any property under your control may be searched without a warrant at any time by any agent of the Department of Corrections [and Rehabilitation] or any law enforcement officer.' (Cal. Code Regs., tit. 15, § 2511, subd. (b)4; see Cal. Code Regs., tit. 15, § 2356 [requiring the department staff to notify the prisoner of the conditions of parole before release].)" (*People v. Schmitz* (2012) 55 Cal.4th 909, 916 (*Schmitz*).) There is no dispute that defendant was on searchable parole at the time of the search.

"When considering constitutional challenges to warrantless and suspicionless parole searches based on a search condition, courts weigh the privacy interests of the parolee against society's interest in preventing and detecting recidivism. Both we and the United States Supreme Court have concluded that such searches are reasonable, so long as the parolee's status is known to the officer and the search is not arbitrary, capricious, or harassing. (See *Samson, supra,* 547 U.S. at pp. 846, 850-856; *People v. Sanders* (2003) 31 Cal.4th 318, 332-334 []; *People v. Reyes* (1998) 19 Cal.4th 743, 750-754 (*Reyes*).) '[P]arolees . . . have severely diminished expectations of privacy by virtue of their status alone.' (*Samson, supra,* 547 U.S. at p. 852.) 'As a convicted felon still subject to the Department of Corrections [and Rehabilitation], a parolee has conditional freedom—granted for the specific purpose of monitoring his transition from inmate to free citizen." (*Reyes, supra,* 19 Cal.4th at p. 752.) The state, by contrast, 'has an " 'overwhelming interest' " in supervising parolees because "parolees . . . are more likely to commit future criminal offenses." *Pennsylvania Bd. of Probation and Parole* [*v. Scott* (1998) 524 U.S. 357, 365 [141 L.Ed.2d 344]] (explaining that the interest in combating recidivism "is the very premise behind the system of close parole supervision").' (*Samson, supra,* 547 U.S. at p. 853.) 'The state has a duty not only to assess the efficacy of its rehabilitative efforts but to protect the public . . . .' (*Reyes, supra,* 19 Cal.4th at p. 752.) Accordingly, a parolee does not have a legitimate expectation of privacy that would prevent a properly conducted parole search. (*Samson, supra,* 547 U.S. at p. 852; *Reyes, supra,* 19 Cal.4th at p. 754.)" (*Schmitz, supra,* 55 Cal.4th at pp. 916-917.)

" '[A] parole search could become constitutionally "unreasonable" if made too often, or at an unreasonable hour, or if unreasonably prolonged or for other reasons establishing arbitrary or oppressive conduct by the searching officer.' [Citations;] see *In re Anthony S.* (1992) 4 Cal.App.4th 1000, 1004, [a search is arbitrary and capricious when the motivation for the search is unrelated to rehabilitative, reformative or legitimate law enforcement purposes, or when the search is motivated by personal animosity toward

25

the parolee]; *People v. Bremmer* (1973) 30 Cal.App.3d 1058, 1062 [unrestricted search of a probationer or parolee by law enforcement officers at their whim or caprice is a form of harassment].)

"Where the search is for a proper purpose, we hold that, even in the absence of particularized suspicion, a search conducted under the auspices of a properly imposed parole search condition does not intrude on any expectation of privacy 'society is "prepared to recognize as legitimate." ' [Citations.]" (*Reyes, supra,* 19 Cal.4th at pp. 753-754.)

Pursuant to these authorities, we conclude the warrantless search of defendant was lawful. As a parolee, defendant had a severely diminished expectation of privacy. His expectation did not overcome the state's countervailing interest in rehabilitating him as well as protecting the public. Moreover, there is no evidence the search was arbitrary, capricious, or harassing. Two male officers performed the search only once, on the afternoon of defendant's arrest, and in a private room. They did not search defendant on a whim. Rather, they took the swabs for legitimate law enforcement purposes upon learning from an investigator that T. identified defendant as the person who raped and sodomized her. The search's scope, though directed at intimate parts of defendant's body, was limited to only those body parts likely to provide evidence of a crime. There was no evidence that either of the performing officers harbored any animosity towards defendant. These facts demonstrate the search was reasonable.

Defendant contends the search was unreasonable because the police waited an unreasonably long time after his arrest to perform the search and could have obtained a warrant during that time. The evidence, however, indicates police did not perform the search until after learning T. had identified defendant, and there is no evidence suggesting police waited an unreasonably long time after learning this information to perform the search. Moreover, police had no need to obtain a warrant, as they knew defendant was on searchable parole and probation.

26

Defendant also claims the court erred by imposing on him the burden of showing the search was arbitrary or harassing. The court did not err. "[O]nce the prosecution has offered a justification for a warrantless search or seizure, defendants must present any arguments as to why that justification is inadequate. [Citation.] Otherwise, defendants would not meet their burden under section 1538.5 of specifying why the search or seizure without a warrant was 'unreasonable.' This specificity requirement does not place the burden of proof on defendants. [Citation.] As noted, the burden of raising an issue is distinct from the burden of proof. The prosecution retains the burden of proving that the warrantless search or seizure was reasonable under the circumstances." (*People v. Williams* (1999) 20 Cal.4th 119, 130.)

Defendant presented no argument establishing why the prosecution's justification for the warrantless swabs was inadequate. The prosecution bore the burden of establishing the search was reasonable, and it met that burden beyond a reasonable doubt.

V

*Instructions on Admissions*

Defendant contends the trial court erred when it did not instruct the jury to consider with caution any of his incriminating statements, an instruction that is part of CALCRIM No. 358, and when it did not instruct on the corpus delicti rule found in CALCRIM No. 359 that the jury could not convict defendant solely on his out-of-court statements. We conclude the trial court had no duty to caution the jury sua sponte using CALCRIM No. 358 or to instruct using CALCRIM No. 359.

At the time of trial, the court had an obligation to caution the jury sua sponte on defendant's incriminating statements, as currently provided in a bracketed portion of CALCRIM No. 358. (*People v. Beagle* (1972) 6 Cal.3d 441, 455, fn. 4.) Since then, however, our Supreme Court has determined a trial court no longer has that duty. (*People v. Diaz* (2015) 60 Cal.4th 1176.) The high court wrote: "Reconsidering the issue in light of the general principles regarding the court's duty to provide instructions, we

27

conclude that the instruction need not be given sua sponte.  The cautionary instruction on admissions is no longer '*necessary* for the jury's understanding of the case' [citation, original italics] because courts are now required to instruct the jury, in all criminal cases, concerning the general principles that apply to their consideration of witness testimony. (*People v. Rincon–Pineda* (1975) 14 Cal.3d 864, 883-884.)"  (*People v. Diaz, supra,* 60 Cal.4th at p. 1190.)

Here, the trial court instructed the jury on the principles that applied to their consideration of witness testimony.  (CALCRIM No. 226.)  The court thus did not commit error in not cautioning the jury sua sponte using CALCRIM No. 358.

We turn to defendant's claim that the court erred by not instructing the jury with CALCRIM No. 359, the corpus delicti rule.  "Whenever an accused's extrajudicial statements form part of the prosecution's evidence, the cases have . . . required the trial court to *instruct* sua sponte that a finding of guilt cannot be predicated on the statements alone.  [Citations.]"  (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1170, original italics, fn. omitted.)

However, the corpus delicti rule does not apply to all statements made by defendant.  It applies "to preoffense statements of later intent as well as to postoffense admissions and confessions [citation], but not to a statement that is part of the crime itself."  (*People v. Carpenter* (1997) 15 Cal.4th 312, 394, italics omitted.)  Thus, if the only statement by a defendant admitted into evidence is one that was part of the crime, the trial court is not required to give the corpus delicti instruction.  (*Ibid.*)

All of defendant's statements introduced into evidence were statements he made to his victims while he was sexually assaulting them or criminally threatening them. Because each was a part of a crime, the court was not required to give CALCRIM No. 359 to the jury sua sponte.

# VI

## *No* Marsden *Hearing*

Defendant contends the trial court erred when it did not conduct a *Marsden* hearing (*People v. Marsden, supra,* 2 Cal.3d 118) in response to a letter defendant sent the court and to defense counsel's request to relay defendant's complaint about counsel's performance. We conclude the trial court was not required to hold a *Marsden* hearing under these circumstances.

### A.    *Background information*

Defendant waived his presence at most of trial. On October 2, 2012, the day closing arguments were to commence, the court informed the parties it had received an inmate request form from defendant, dated the previous day, asking to be present for the rest of trial. Defendant then appeared, and the court asked him if he was interested in being present for the rest of his trial. Defendant said he thought so, but he wanted to discuss it with his attorney. After consulting with counsel, defendant decided he would return to jail.

After defense counsel completed his closing argument, and outside the presence of the jury, the court informed the parties it had just received another letter from defendant. This one was dated September 28, 2012, and had been emailed to the court that morning. In the letter, defendant said defense counsel told him and his family they had nothing to worry about. But on the first day of trial, counsel said he wished there was something he could do for defendant. Defendant wrote that he and counsel never sat down together to go over his case issue by issue. He asked counsel to make a motion for discovery, but counsel said it was not necessary. But then defendant heard the district attorney had taken some photos. He asked counsel to send him legal paperwork, discovery, toxicology reports, photos, and witness statements. He even had to send people to the public defender's office. Defendant said counsel only "fed [him] to[] the wolves"; counsel even

29

filed motions that did not apply to defendant's case. Defendant concluded the letter by asking the court to "please call me over so I can take the stand."

After reading the letter, the court stated: "This letter predates, clearly from its context, the appearance of [defendant] this morning. I see no need to do anything with it." The court asked defense counsel if he wanted to comment on it. Counsel did not. The prosecutor agreed with the court's response to the letter.

At sentencing, defendant appeared briefly to waive his presence. After the court confirmed with him that he wanted to absent himself from victim impact statements and sentencing, defendant stated, "I've spoke[n] to [defense counsel]. Uhmmm, he's going to relay some things, and I'm fine. I'm good to leave."

Before the court imposed the sentence, defense counsel asked if it was the right time to relay defendant's message to the court. The prosecutor objected, and the court stated it would allow counsel to make his statement after sentencing was complete so there could be no argument that defendant's comments influenced the court.

After the court imposed sentencing, defense counsel stated his client wanted him to register a complaint about his performance. The prosecutor objected, claiming defendant at that point had lost his right to make any statements to the court. His only avenues were through appeal or habeas corpus proceedings. The court determined to hear counsel after it calculated custody credits the following day.

The next day, after calculating custody credits, the court allowed defense counsel to speak. Counsel stated defendant wanted to complain about counsel's "lack of calling certain witnesses," and counsel told him he would inform the court of his concern. The court responded: "Then I think you've done your duty in that regard, and he can raise that and any other issue he thinks is appropriate in his . . . appeal or any writs he might want to take." Counsel then put on the record the names of the five witnesses defendant had wanted him to call. Defendant did not appear at this hearing, having waived his presence the day before.

B.    *Analysis*

Defendant contends he was entitled to a *Marsden* hearing.  *Marsden* grants to a criminal defendant "a right to substitute counsel on a proper showing that his constitutional right to counsel would otherwise be substantially impaired." (*People v. Nakahara* (2003) 30 Cal.4th 705, 718 (*Nakahara*).)  "[T]he defendant is entitled to present evidence or argument on the matter of substitute counsel, assuming he has *clearly indicated that he wants a substitute*." (*Ibid.*, italics added.)  "The mere fact that there appears to be a difference of opinion between a defendant and his attorney over trial tactics does not place a court under a duty to hold a *Marsden* hearing." (*People v. Lucky* (1988) 45 Cal.3d 259, 281.)

At no time did defendant clearly indicate to the court he wanted substitute counsel.  Instead, he expressed frustration over counsel's trial tactics.  Defendant effectively told the court his attorney had not done what he had asked him to do.  He had not called certain witnesses, moved for discovery, or provided certain paperwork as defendant had requested.  But defendant did not clearly ask for substitute counsel.  Defendant asked the court to bring him in so he could testify, but then expressly abandoned that request, leaving the direction of his trial in counsel's hands.

"[A] 'conflict' regarding tactical matters neither justifies substitution of counsel nor signals a fundamental breakdown in the attorney-client relationship." (*Nakahara, supra,* 30 Cal.4th at p. 719.)  Defendant's allegations reflect a disagreement over trial tactics.  They do not, however, indicate he requested new counsel based on specific facts showing a deterioration of the attorney-client relationship. (*Ibid.*)

Defendant contends the trial court denied counsel an opportunity to raise defendant's complaints prior to judgment.  If that be error, it was not prejudicial.  When the court allowed counsel to speak, counsel simply relayed defendant's complaint about trial tactics; specifically, counsel's decision not to call certain witnesses to testify.  Again, a difference of opinion over trial tactics does not require a court to hold a *Marsden*

31

hearing.  Had defendant or counsel raised the complaint earlier in the trial, the court still was not obligated to convene a *Marsden* hearing.  He was not entitled to one based on the complaints he raised.

## VII

### *Cumulative Error*

Defendant claims cumulative error deprived him of a fair trial.  We disagree. Except for reversing the kidnapping enhancements, we have found no error that deprived defendant of his constitutional rights, including a fair trial.  "Whether considered individually or for their 'cumulative' effect, [any errors we have found] could not have affected the process or result to defendant's detriment."  (*People v. Sanders* (1995) 11 Cal.4th 475, 565.)

## VIII

### *Remaining Arguments*

Defendant contends, and the Attorney General agrees, that his sentence on count 9 should be stayed under section 654.  Defendant also contends, and the Attorney General agrees, that the abstract of judgment requires two sentencing corrections.  Because the trial court's resentencing of defendant on remand will affect these arguments and result in an amended abstract of judgment, these arguments are now moot.

## DISPOSITION

The kidnapping and aggravated kidnapping enhancements on counts 3 and 6 are reversed, and the sentence on count 9 is ordered to be stayed.  In all other respects, the judgment is affirmed.  The matter is remanded to the trial court solely for resentencing.

The superior court is directed to file with the Department of Corrections and Rehabilitation an amended abstract of judgment upon resentencing.

     NICHOLSON    , J.

We concur:

     BLEASE    , Acting P. J.

     DUARTE    , J.