Filed 3/22/24  P. v. Aiello CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE, | C096502 |
| Plaintiff and Respondent, | (Super. Ct. No. 22CR0083) |
| v. | |
| JEFFERY KEITH AIELLO, | |
| Defendant and Appellant. | |

Defendant Jeffery Keith Aiello appeals from his convictions of aggravated kidnapping and multiple sex offenses against six minors.  He contends (1) the trial court abused its discretion and violated his due process rights when it admitted evidence of sex dolls found in his home; (2) insufficient evidence of asportation supported his conviction of aggravated kidnapping and a true kidnapping finding for purposes of the one-strike allegation; (3) the trial court erred by not instructing sua sponte on the offense of felony false imprisonment, a lesser included offense of aggravated kidnapping; and (4) the

1

abstract of judgment contains clerical errors. Other than to direct the trial court to correct the abstract of judgment, we find no prejudicial error and affirm the judgment.

FACTS AND HISTORY OF THE PROCEEDINGS

A.      Doe 5 and Doe 6

Doe 5 and Doe 6 are sisters. They were raised in a small, "very sheltered" Mormon town in Utah. Defendant is their father's nephew by adoption. The sisters called him "Uncle Jeff." They first met him at a family reunion in 1998 in California. Doe 5 was 12 years old at the time. Doe 6 was 10 or 11. Defendant was in his mid-thirties. He was born in 1963. The sisters would visit defendant during the next three summers, 1999 through 2001.

1.      Summer of 1999

In the summer of 1999, the sisters spent about three weeks in California with their relatives. Part of that time, they stayed with defendant. It was exciting to be at his home. They did fun things, including swimming, boating, knee boarding, wakeboarding, and going out to dinner. Defendant took the girls shopping once or twice a week and would buy them clothes. He said he wanted them to have a good time.

Defendant was very attentive to the girls. He made Doe 5 feel like he wanted her around often. He asked her to come sit by him or sit on his lap. When he and the girls were sitting, he wanted to hold their hands. When they were walking, he was very affectionate and gave them lots of hugs and kisses. He kissed them on the lips because he said it was a more friendly way of saying hello. Defendant would kiss Doe 6 on the lips and smack her butt. It happened casually when walking and being around the house.

Defendant gave the sisters alcohol to drink. He explained that wine was an alcoholic drink, and they could have some of his wine. They tried it, but Doe 5 spit it out over his balcony because it did not taste good.

2

During that first summer in California, Doe 5 found Playboy magazines in the bathroom at defendant's work. Defendant encouraged her to look at them as they were educational. Defendant also showed her pornographic magazines at his home. They looked at the magazines together and sometimes with Doe 6.

Doe 6 testified that defendant showed the sisters pornographic videos. The videos depicted men and women having sex. Doe 6 was uncomfortable and did not understand what has happening. She had never seen pornography before.

In addition to viewing pornographic magazines with defendant, Doe 5 also viewed the magazines alone; she wanted to know more. Defendant had told the sisters that Mormons were taught sex was a bad thing. He wanted them to know that sex was a good and beautiful thing shared between two people. He encouraged them to view the magazines to learn more about it and to learn about their bodies.

He encouraged the girls to masturbate. Using the magazines, he explained erotic zones, stimulation, and orgasm in terms they could understand. He said sex was a natural thing, and the girls should masturbate and rub their crotch areas to become familiar with those feelings and to experience them themselves.

He showed Doe 5 pornographic magazines depicting men and women having intercourse and a box of sex toys in his bedroom. He explained how the toys could be used for masturbating and for teaching her how to have sexual pleasure with herself or a future partner. He said he was going to educate and teach her.

Defendant spent a lot of time telling the sisters that they should not tell their parents about the things they had talked about. Their parents had "brainwashed" them to believe that these were bad, so they would not understand that he and the sisters had been talking about them.

Defendant molested Doe 6 while he was visiting Utah. After being out for the day, everyone started going to bed. Defendant stayed on the couch and had Doe 6 stay with him. When the lights were out, defendant lay on the couch. Doe 6 knelt beside him and

tickled his arms and chest, something defendant liked the sisters to do. Defendant pushed her hand down to tickle his stomach. She brought her hand up, and he pushed it down more. He pulled out his penis and had her touch him, trying to get her to squeeze. She pulled back, but he pushed her hand down again and, grasping her hand to him, would move her hand up and down. He touched himself for a bit, and then they went outside.

He told her that adults touch each other and made each other feel good to show that they loved each other. He said the more acts she did, the more it made him love her.

2.      Summer of 2000

After the sisters arrived at defendant's new residence in the summer of 2000, defendant wanted to talk more about "education" and the things he had taught them. He insisted that 14-year-old Doe 5 sleep in his bed with him, while Doe 6 could sleep on a couch in his bedroom. He didn't have any other place for them to sleep.

After one night of watching movies, and while Doe 6 slept on the couch, defendant and Doe 5 viewed on his TV men and women having intercourse. He explained sexual intercourse to Doe 5. They went to sleep, and Doe 5 woke up to defendant touching her breasts over her shirt. She froze as defendant continued fondling her over and under her shirt. Doe 5 was scared. Pretending to be asleep, she rolled over onto her stomach and placed her arms over her breasts. This became a nightly routine as defendant tried to fondle her breasts each night.

Defendant also taught Doe 5 how to French kiss. After watching a movie with her, he asked if she knew how to French kiss. She did not, and he asked if he could show her. Scared and not understanding, she did not respond. He told her how it was done. Then he leaned in, kissed her, and put his tongue in her mouth. This went on for a few minutes. For the remainder of the sisters' stay, defendant at night would occasionally lean in and French kiss Doe 5.

4

Daily, defendant lay in bed in his underwear or shorts, and he asked the sisters to tickle his back, chest, and arms lightly with their fingernails. He had an erection when they did this. He often guided their hands toward his groin area while they tickled him.

For Doe 6, the second summer at defendant's home was similar to the first: more grabbing, smacking butts, holding hands, and sitting on laps. She commented to her sister that defendant did not pay her any attention during the day; he was paying more attention to Doe 5.

3.     <u>Summer of 2001</u>

The third summer with defendant was the worst summer for Doe 6. Once, after watching a movie, defendant sent Doe 5 out to get some food, and he pulled Doe 6 onto his bed with him. He took his shirt off, pulled his penis out, and pulled her toward him. He tried to kiss her on her mouth, explaining that kissing is what people do to show they love each other. He had her kiss his chest and tried to have her suck on his nipple. Then he held her hand on his penis while he stroked himself. She tried to pull her hand away, and when she finally did, he continued and ejaculated. He would always get upset and be disappointed if she pulled away like that and he did not finish. The next day, he would ignore her and be short with her, and she did not understand why.

During this summer, defendant and the sisters went to Tahoe and met their cousins and uncles there. The three of them were in the hot tub when it was dark out. Defendant had Doe 6 sit on his lap. He had an erection, and he rubbed her crotch and butt area against it. He also rubbed her breasts over her swimsuit.

That night, the three slept in the same room in a bed. Defendant wanted to sleep in between the two girls, but Doe 6 got in the middle. After Doe 5 fell asleep, defendant rolled over, put his hand up Doe 6's shirt, and touched her breasts. She pushed his hand down, and he slid his hand down her pants and touched inside her vaginal lips. She turned over to turn away, and he slid his hand down her backside. He tried to separate

her butt cheeks and "go through," but she pulled away. The next day, defendant did not speak with her.

The third summer for Doe 5 was similar to the prior summer; sleeping with defendant, him reaching for her breasts, and him once cupping her groin area over her clothing.

Defendant had the sisters pose for photos by his Corvette. He bought the girls skirts and tank tops to wear for the photos. He had them position themselves over the car so that their bums were facing the camera as much as possible while they looked over their shoulders. He posed Doe 6 to lie on the windshield and spread her legs more. She altered the pose because it was uncomfortable while wearing a skirt.

From the beginning of their relationship and "every time," defendant instructed the sisters not to tell anyone what was happening. If they told their parents, the parents would not allow them to visit him in California. Doe 5 was afraid she and her sister would get in trouble if they told their parents.

After the third summer, the sisters informed their parents and made reports with Utah authorities. Doe 5 was scared, upset, nervous, and crying when she spoke with her mother. Doe 6 was nervous and upset but not as emotional as Doe 5.

B.      Doe 2

Doe 2 was born in 1995. Defendant is her uncle. Doe 1 and Doe 3 are her cousins. Doe 2 had mixed feelings about defendant growing up. Defendant was the fun uncle, but she had many negative experiences with him that made her feel uncomfortable.

When Doe 2 was approximately five years old, she spent the day at her grandmother's house. She wore a dress without wearing panties. Defendant picked her up and supported her by placing his hand underneath her dress and on her vagina. Doe 2 felt this was not right and it made her feel uncomfortable, but she did not say anything.

At approximately nine years of age, or in roughly 2003 or 2004, Doe 2 went on a camping trip with her extended family. After swimming, she, defendant, Doe 3, and Doe 3's brother played around in the back of her family's Suburban. Doe 3 gave her brother a "purple nurple"; she grabbed his nipples and twisted them. That evening around the campfire, defendant asked Doe 2 to go with him to get something out of his car. Out of sight from everyone, defendant asked Doe 2 to grab and squeeze his nipples and to kiss him. She complied, feeling she had no other option. They had an extended kiss on the lips of approximately five seconds. Doe 2's family often greeted family members with a kiss, but defendant would hold his kisses with Doe 2 longer than she thought was appropriate.

In the summer of Doe 2's sixth or seventh grade years, defendant stopped by to visit her family. He went into Doe 2's bedroom where Doe 2 was alone, and he asked her to show him her drawer of underwear and bras. Doe 2 kept refusing, but defendant kept asking and cornered her in the bedroom. He said he would stop asking if she would lift up her shirt and show him what was underneath. Feeling she had to do it, she lifted her shirt. She was wearing a bra.

At a family dinner when Doe 2 was 16 or 17 years old and while they were alone, defendant asked her about what intimate activities she had with her boyfriend and whether they were engaging in various sex acts. Doe 2 felt extremely uncomfortable, but again feeling she had no option, she shared information with him.

Doe 2 did not disclose the molestations for a long time. She was very close with her grandmother, defendant's mother, and she did not want to hurt her. But she later recognized that she had cousins who were around her age, and if defendant was "doing this" to her, he was probably doing it to them. She reached out to Doe 1 and asked if this had happened to her. She also had previously told her boyfriend what had happened to her.

7

Doe 2 had mixed feelings about testifying. She was very nervous knowing it would be an uncomfortable experience, but she knew it was the right thing to do.

### C.    Doe 3

Doe 3 was born in 1994. Defendant is Doe 3's father's cousin. She called him Uncle Jeff. He was the fun, cool uncle that had fun stuff and lots of toys.

When Doe 3 was about nine or 10 years old, in approximately 2003 or 2004, she and her cousins, Doe 1 and Doe 2, spent the night in defendant's room after a family get-together. They sat on the floor and watched a movie with defendant. After the other girls fell asleep, defendant cuddled up next to Doe 3. He rubbed her back, and then he rubbed her chest and vaginal area under her clothes. He put her fingers into his mouth and sucked and bit them, and then he put his fingers in her mouth and told her to do the same. Doe 3 felt weird and confused while this happened.

Defendant spoke with Doe 3 about masturbation when she was 14 or 15 years old. He asked her if she had ever masturbated, or "flicked [her] bean." She felt weird, but he said it was normal and natural to masturbate and she should not be embarrassed.

When Doe 3 was about 22 years old and had children, defendant always told her how good looking she was and that she was a "milf," meaning a "mom I would like to fuck."

Doe 3 decided to come forward about the molestation after Doe 2 contacted her a couple of years before trial and asked if something inappropriate had happened to her with defendant. She told Doe 2 and Doe 1 the gist of what had happened, but she did not go into detail. Doe 2 said that something had happened to her and to Doe 1. Doe 3 had also first confided to a high school friend and her brother. She did not tell anyone else because defendant was always the fun uncle and she had good memories with him. She also felt like she was the only one, and she justified not disclosing by telling herself no one would believe her because everyone liked defendant.

Doe 3 felt guilty about not having said something earlier. She was the oldest of the three cousins, and if she had disclosed the molestation earlier, perhaps defendant's molestations of Doe 1 and Doe 2 might not have happened. Doe 3 did not want to testify at trial. She had handled the problem by burying it and not talking about it. Bringing it up by testifying caused her anxiety and fear.

D.    <u>Doe 1</u>

Doe 1 was born in 1995. Defendant is her second cousin, once removed, but she always referred to him as Uncle Jeff. While she was growing up, defendant was the cool uncle and was very open to talking about things.

When she was about 12 or 13 years old, or approximately in 2007 or 2008, and during an extended-family camping trip, Doe 1 told defendant that she was having some issues with her parents. He told her to wait until everyone was asleep, and then to come to his tent where they could talk about it.

After everyone fell asleep, Doe 1 went to defendant's tent. An uncle and aunt's tent was approximately 10 feet away. Doe 1 called out defendant's name, and defendant unzipped and opened the tent door. He was naked. When she saw him naked, she did not want to go inside the tent. Defendant reached outside the tent, grabbed her hand, and pulled her into the tent. It was not violent; he pulled her by her arm inside the tent and to his cot, a distance of four feet from where she had stood outside. He zipped the tent closed and stood naked between her and the door. She was "shocked and frozen with fear" and did not know what to do. She had never seen a naked man before. He held her arm and she could not run away.

Defendant had Doe 1 lie down on the cot and began kissing her. They were under the covers. He kissed her ear and neck and on her lips. He reached under her clothes and touched her breasts and all around her vagina and pubic region. Then he heard something

9

outside.  He rolled on top of her, covered her nose and mouth with his hand, and told her not to say anything.  He had an erection.  She feared he was going to rape her.

Defendant got off of her after a couple of minutes.  He started kissing her again, but she said, "No," got up, and left the tent.

Within a month of the incident, defendant called Doe 1 on her family's house phone.  He said he thought he owed her an apology, and he told her she was not allowed to tell anybody what "we did" because both of them could get into a lot of trouble.

Another night at the same family campout, as Doe 1 was inside her tent getting ready to go to bed, defendant unzipped her tent door from outside.  She did not want him to come inside, so she stepped out.  He gave her a hug, grabbed her butt, and touched her over her clothes.  He said, " 'Thank you.  Your Uncle Jeff needed this.' "  He continued to touch her butt and grope her over her clothes.  She gave him a hug and went back into her tent.  She was scared.  Her younger brother was with her, and she did not want him to see his big sister groped by her uncle.

When Doe 1 was about 14 or 15 years old, defendant asked her if she masturbated or had sex, what that felt like, and how she did it.  When she was around 18 years old, she was with him in his car during one of the family campouts.  They smoked some marijuana, and then defendant pulled out his penis and started to masturbate.  He asked her, " 'Will you just do it for me?' "  She refused.  Continuing to masturbate, he asked her to " '[j]ust rub my nipples.' "  She got out of the car.

Doe 1 first disclosed the molestation to her boyfriend while in high school.  She also told a few of her girlfriends.  One friend recalled that Doe 1 was very upset when she disclosed the molestation.  She finally told her family and law enforcement after Doe 2 had asked her if defendant had done anything inappropriate.  She also discussed the molestations with her cousins and with Doe 5 and Doe 6, but they did not talk about them in detail.  She decided it was best to disclose because defendant could potentially be

10

molesting other little girls.  She wanted to testify because it was important for the safety of all little girls that may come in his vicinity.

E.      Doe 4

Doe 4 was born in 2000.  She called defendant her uncle, although he was her cousin.  He was always the cool uncle.  He had a pool and a dog, and they were always having fun at his house.

In 2015, defendant took 14-year-old Doe 4 and her brother to a relative's house in Truckee.  She and defendant were downstairs alone watching TV when defendant asked her to rub his feet.  She said no.  He asked her to rub his shoulders.  She again said no. He asked to rub her shoulders.  She said no, but while she was lying on the couch, he started rubbing her shoulders from behind.  He reached around and touched and fondled her breasts over her shirt.  She got up and quickly walked away.  He walked after her, grabbed her, and yanked her hard into his body.  There was music playing on the TV, and he tried to dance with her.  He told her to calm down and that it was not that big of a deal. She dug her fingernails into his arm, and he let go.  She ran to the bathroom and locked the door behind her.

Defendant pounded on the bathroom door, telling Doe 4 she did not need to freak out and that this was totally normal.  After she told him to go away, he said that if she said anything about the incident to anybody, it would break apart the family, and she did not want that.  She stayed in the bathroom for about two hours until defendant drove her home.

Doe 4 told a friend at school the next school day about the incident.  The friend recalled that Doe 4 was uncomfortable and sad when she disclosed.  She did not give too many details because she was uncomfortable.  Doe 1 also reached out to Doe 4 later and asked if defendant had ever tried anything with her.  Doe 4 wanted to testify because she did not want defendant to have the opportunity to molest another girl.

F.    Defendant's police interview

Detectives interviewed defendant at his home in 2020 as part of executing a search warrant. Defendant said his nieces were "all cute girls. I mean, there's just no way around it, they're all cute girls, right." He enjoyed their attention: "I like their admiration and attention stuff. It's [*sic*] makes me feel good, right, I'm a guy."

Addressing allegations about his relationship with Doe 1, defendant said that when Doe 1 was 16 or 17 years old, she flirted with him. "And I was enjoying that. It was pretty fun and stuff. . . . I'm partial to girls opposed to guys just because I'm a guy, you know, all that stuff, and I love beautiful girls. Um – beautiful women I should say, females . . . ."

Once while camping, and after he had got in bed, Doe 1 came to his tent. She asked to come in. He told her to come in, but she could not work the zipper. Defendant sleeps without wearing any clothes. He got out of his sleeping bag, started the zipper for her, and jumped back into bed. He said he did not expose himself, but Doe 1 may have "caught a glimpse of his white ass" as he jumped back into his sleeping bag. They talked for a minute, and then Doe 1 said she wanted to go. He said she could stay. He heard his mother in the next tent say something, and that was all that happened.

At another camping trip when Doe 1 was 19 or 20, he smoked weed with her and others while they were out late. The next morning, as he was driving away from camp, he saw Doe 1 on the side of the road drinking and smoking some weed. Defendant said, "[A]gain, she's 19 or 20. And 19 to 20 to me at this point, she's a hot looking 19, 20-year-old girl . . . and she's over 18 . . . . And so, you know, drinking, smoking weed on the side road, cute girl, now of age and everything and flirtatious, so I'm like I pull next to her." She got in the car and gave him a hit and a drink. Defendant continued, "I know what I'm thinking at this point. Um -- been a long time coming, and she's this age . . . . So -- um – we're sitting there and she's wearing some low-cut top. And so, I said to her,

12

I'm like show me your tit. So, she did. So, I kissed it. And she seemed to like it." For reciprocation, he told her to "squeeze my nipple, you know, get off, or whatever like that." She started squeezing his nipple but then said she could not do it. Defendant asked her not to "leave [him] hanging," but she got out of the car.

Defendant denied touching any of the victims except for Doe 1 when she was an adult. He said, "I never touched them on any inappropriate part of their body. Any of them ever." The victims were "straight up lying." Suggesting what Doe 5's and Doe 6's motivations were, defendant said there had been animosity between his family and their family over money. He also remembered that the two girls were not happy when he introduced his wife to them. As for the other victims' motivations, defendant suggested their motive was money. He and his brother, Brian, who was Doe 2's father, were disputing over their mother's estate. Family members were struggling with money, and they believed he had lots of it. Brian was "at the forefront and the spearhead of this."

Defendant discussed sex dolls the officers would find while searching his home. He said they don't get sick or get older. They don't talk back and "they're fully functional." Because he was getting older, he could not "get beautiful girls anymore." Online dating was unsuccessful because "as soon as you put your age, chicks will not even look at you. [¶] . . . [¶] [S]o I can't hook up, dude." "[T]he only way you get a hot chick at my age is if you got money to burn." Instead of staring at a magazine or a video, he decided to buy the dolls to have "something a little more realistic."

Defendant favored the sex dolls over older women. He said, "[C]hicks eventually – no matter how hot they are, eventually they ain't good looking no more," and "they keep getting wrinklier [*sic*] . . . ." "[T]he next worse thing is tits that are just literally hanging back, there's no way." At his age, his only choices were women in their 40's, and "[w]omen in the 40's by definition, especially if they had kids, it ain't the same ballgame. And a lot of times it can be a horrific ballgame. You don't know unless you

13

meet them on the beach that that's the case. Doing online dating girls don't post themselves wearing that kind of stuff."

The sex dolls, by contrast, were "an amazing investment;" "[t]hey don't get sick and won't get any older and they never die." Defendant stated that for the amount of money, "compared to what I haven't spent on girls, because I haven't had a chick in a long time," the dolls were "a no-brainer." "[I]t was very, very logical because of my age, my attraction to beautiful girls . . . ."

Defendant loved "anything that's beautiful that's of age." He argued that his attraction to beautiful girls should not work against him. Younger girls are attractive. Magazines that display women get them as close to 18 as possible because "nature's set up that way"; that is the way "it used to be before we became civilized." It is a difficult thing being a guy who is attracted to girls. What men are and what people are attracted to is biological. The reason why men are "pigs" and women "always claim that stuff" is because it's "locked in your DNA. And it's a difficult thing. Um – and you can make all the laws that you want . . . but it's not supposed to be, I'm just telling the truth. [¶] . . . [¶] [I]t all makes sense, but there's laws and you have to follow the law."

Officers found three, life-sized sex dolls in defendant's home. The dolls were in a bedroom facing defendant's open bedroom. They were clothed from the waist up. Each doll had its own clothing. One doll had a Minnie Mouse shirt. They were adult dolls. Photographs of the dolls as they were found were admitted into evidence.

G. Expert testimony

A detective testified as an expert in sexual assault investigations and grooming. Grooming consists of steps a perpetrator takes that ultimately result in a child molestation. Generally, a perpetrator will (1) identify the potential targets based on the characteristics he likes in his victims; (2) gain the victim's trust and then gain access to the victim; (3) play a role in the victim's life; (4) isolate the victim; (5) create secrecy in

14

the relationship; (6) initiate sexual contact, innocently at first but progressively more serious; and (7) control the relationship, usually by threatening or blaming the victim.  In many cases, the perpetrator will be grooming several targets each at different stages of grooming.  If a target ages out of the perpetrator's desired range, another person will be brought in.

Dr. Anna Washington, a licensed psychologist, testified as an expert in Child Sexual Abuse Accommodation Syndrome (CSAAS).  CSAAS identifies five categories or common patterns of behavior observed in children who have been sexually abused.  Not all patterns apply to all victims.  Some victims may exhibit some patterns and others may exhibit other patterns.  The five patterns are (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed, conflicted, and unconvincing disclosures; and (5) recantation.

As for secrecy, most child abuse occurs within the victim's preexisting positive and trusting relationship with the perpetrator.  This allows the perpetrator to have access to the victim alone and to make sure the victim does not tell anyone about the abuse.  The sexual abuse is introduced through grooming, leaving the victim very confused over the feelings she has for the perpetrator.

The pattern of helplessness helps dispel the myth that child victims should scream, run away, or fight off the abuser.  Most victims feel helpless because the perpetrator is often a much bigger person, and they may rely on the perpetrator to meet their needs.  It also is not always clear to the victim that the abuse is inappropriate.  A child may respond to the abuse by immediately freezing and not being able to move their bodies.

The pattern of entrapment and accommodation describes how a victim feels entrapped in the relationship with the perpetrator.  The abuse tends to be ongoing and may occur over months or years, and the victim does not feel she can stop the abuse.  In response, the victim develops coping strategies ranging from wearing multiple layers of

15

clothing to developing mental health symptoms such as acting out, aggression, using substances, disassociation, depression, and developmental regression.

The pattern of delayed, conflicted, and unconvincing disclosures describes how most child victims wait weeks, months, or even years to disclose the abuse. They may wait to disclose because they have a positive relationship with the perpetrator or because they believe others won't believe them. When they do disclose, they tend to disclose information incrementally, a little piece of information at a time, and without being able to remember all of the details of what happened.

The final pattern, retraction, describes how a victim may retract a disclosure. A disclosure's consequences may include the victim being placed in foster care, the perpetrator going to jail, and the victim having to testify. The victim may recant, believing that doing so could fix the situation and put the family back together.

### H.    The defense

Defendant testified in his own defense. He denied all of the charges.

Defendant stated that Doe 4 was his favorite niece. She is his favorite because she is very pretty and reminds him of Alicia Vikander, an actress. She also is vivacious, stubborn, and loving. He ranked Doe 3 as his second favorite niece, and Doe 2 and Doe 1 were equally in third place. He could not rank Doe 5 and Doe 6 in comparison to the other nieces because of the different time periods; he loved those two "equally."

Defendant stated the interviewing detectives asked him which of his dolls was his favorite. He told them his newest doll was his favorite, the one that replaced one of the original dolls. "[H]er rear end was the best one out of all three of them, even though it was the same 24, 36, 24, it had – it was a different version." That doll was manufactured better than the others, he liked her skin, and "she just all around looked the hottest." Defendant did not have a second favorite.

We will describe more of defendant's testimony as relevant below.

16

## I.    Verdicts and sentencing

The jury found defendant guilty of 11 sex offenses. As to Doe 1, defendant was guilty of kidnapping for the purpose of committing a lewd act on a child under the age of 14 (count 1) and committing a lewd act on a child under the age of 14 (count 2). (Pen. Code, §§ 209, subd. (a)(1); 288, subd. (a) [(statutory section citations that follow are to the Penal Code unless otherwise stated)].) The jury also found true that as to count 2, defendant committed the offense under the circumstances of the one strike law. (§ 667.61, subd. (a).)

As to Doe 2 and Doe 3, the jury found defendant guilty of committing a lewd act upon a child under the age of 14 (counts 3, 4 respectively). (§ 288, subd. (a).) As to Doe 6, defendant was guilty of four counts of committing a lewd act upon a child under the age of 14 (counts 8-11). (§ 288, subd. (a).) The jury found true as to counts 2-4 and 8-11 that defendant's crimes involved multiple victims under section 667.61, subdivisions (b) and (e).

The jury found defendant guilty of committing against Doe 4 one count of a lewd act on a child that was 14 or 15 years old when he was at least 10 years older (count 5), and two counts of the same offense against Doe 5 (counts 6, 7). (§ 288, subd. (c)(1).)

The trial court sentenced defendant to a prison term of 100 years to life plus three years, four months, calculated as follows: 25 years to life on count 2; consecutive terms of 15 years to life on counts 3, 4, 8, 9, and 11; the midterm of two years on count 5; and consecutive terms of eight months (one-third the midterm) on counts 6 and 7. The court imposed and stayed under section 654 terms of seven years to life on count 1 and 15 years to life on count 10.

17

DISCUSSION

I

*Admission of Evidence of Sex Dolls*

Defendant contends the trial court committed prejudicial error when it admitted his interview statements regarding the sex dolls and the officers' photos of the dolls. He argues (1) the evidence was irrelevant because it had no tendency to prove he had a proclivity for young girls and children and because law enforcement's discovery of the dolls in 2020 postdated the charged offenses by many years; (2) the evidence was unduly prejudicial under Evidence Code section 352 (section 352); (3) admitting the evidence violated his due process right to a fundamentally fair trial; and (4) admitting the evidence violated newly-enacted Evidence Code section 352.2, which restricts the admission of evidence of creative expressions.

A.     Background

After hearing Doe 6 testify regarding defendant posing her and Doe 5 for pictures, the prosecutor informed the court that she intended to introduce evidence of the sex dolls. She had originally thought the court would exclude the evidence under section 352, but the victim's testimony made the evidence relevant.

Defendant's computer contained hundreds of pictures of the dolls posed in different positions throughout his house and dressed in childlike clothing. The prosecutor claimed the dolls bore a "striking resemblance" to Doe 5 and Doe 6, and their poses were similar to how defendant had posed Doe 5 and Doe 6. The prosecutor also intended to introduce defendant's interview in its entirety, where he spoke about the dolls and explained he tried to get them as close to 18 as possible.

Defendant objected under section 352. The dolls were of adult women, and anything being said about them was prejudicial. The prosecutor gave the court copies of the interview and the pictures to review.

18

The matter came up again during the prosecution's case-in-chief. The prosecutor summarized defendant's interview statements and the photographs for the court. She argued the statement was of a party opponent, an exception to the hearsay rule. The evidence was relevant because it showed his proclivity for liking young girls. He bought two dolls, a blond and a brunette, whose faces looked like Doe 5 and Doe 6. The third doll was a replacement for damage to one of the other dolls. Defendant dressed them in child-like clothing, including a Minnie Mouse shirt. He posed the dolls similarly to how he had posed Doe 5 and Doe 6. These facts, along with his statements in his interview as to why men liked young girls, were so intertwined they were relevant to show his proclivity for liking young girls.

Defendant argued the evidence was extremely prejudicial. The dolls were adult-type dolls with clothing that was appropriate for an adult. They did not support any child molestation issues. The photos were taken by detectives 20 years after the alleged molestations of Doe 5 and Doe 6. Defendant asserted the portions of the interview concerning the dolls could be excised from other relevant portions.

The court stated that admitting all of the photos the prosecutor had presented to it would be cumulative. The prosecutor agreed, stating she had no intention of admitting all of them. She intended to admit only the photos of the dolls in the bedroom to show their similarity to Doe 5 and Doe 6.

The court stated the issue it faced under section 352 was whether the dolls were more probative then prejudicial. The photos were relevant if defendant was posing the victims in the same sexualized pose as the dolls were in, and if defendant dressed the dolls in childlike or adolescent-like clothing. The court had not read the interview transcript in its entirety, so it agreed to read the transcript and rule on the issue the next day.

The next day, the court announced its position after reviewing the transcript and the photos. In its opinion, the bodies of the dolls "are not 12- to 14-, 15-year-old-girls."

19

The dolls' faces, however, were "very youthful." The court continued, "The way that they are dressed in some of the pictures that I have seen appear to be youthful. If, in fact, Defendant was posing the girls in the same manner in which the dolls were posed, and I understand the time difference, nevertheless, if they are posed the same, that's a relevant fact, and I think the jury is entitled to hear that." The court also stated that the parts of the interview where defendant talked about young girls, that the desire for young girls is in men's DNA, and where he talked about aging and women becoming less attractive and desirable as they age were relevant.

The court and the parties agreed to excise certain portions of the interview they deemed to be irrelevant. Over defendant's objection and subject to those excisions, the court admitted defendant's interview statements: "Having reviewed the transcript now for the second time, the Court does find that some of the material in the transcript is quite prejudicial but is also quite probative, and I don't find that it's probative value is outweighed by the prejudice. Defendant makes some incriminating statements. There are a number of places that -- well, Defendant makes statements that are damaging to his case. I think with the portions removed that are being excised, I think the probative value is not outweighed by any prejudicial effect, and I will allow the People to play the interview."

Also over defendant's objection, the court admitted five photos of the sex dolls. The photographs are:

1. People's Exhibit 26: A photo of the three dolls standing with their hands on a bed, their buttocks' exposed, and posed to be looking into defendant's bedroom.

2. People's Exhibit 27: A photo of the same dolls in the same pose taken from the side, with their breasts exposed.

3. People's Exhibit 28: A close-up photo of the brunette doll's face.

4. People's Exhibit 29: A photo of some of the clothes belonging to one of the dolls, including a Minnie Mouse T-shirt.

20

5. People's Exhibit 33: A close-up photo of the blonde doll's face.

The prosecutor's closing argument focused on the victims' credibility, the elements of the charged crimes, and defendant's demeanor while testifying. Her discussion of the dolls comprised less than two pages of her 35-page argument. She stated, "I'm sure that every single one of you when the sex doll picture went up on the screen was like, what in God's name are we dealing with now?" But she explained it was not illegal to have a sex doll or to have sex with a doll. "If it's your thing, it's your thing."

The prosecution had the jury hear about the sex dolls to consider some factors about how defendant treated them. He picked the blond and the brunette with young faces that are similar to pictures of Doe 5 and Doe 6 when they were young. In his testimony, defendant ranked his nieces, and he also ranked his dolls on how much he liked to have sex with them. One of the dolls had a Minnie Mouse shirt, and defendant had other child-like clothing in a drawer. The prosecutor stated that maybe these factors were all coincidental, or maybe they were something more. It was for the jury to consider.

The prosecutor also discussed the "control aspect" of the dolls. She explained, "[Defendant] only likes young, beautiful women. He was very crystal clear about that. Once you have kids, you are broken. Once you have kids, you are gross. Once you get to a certain age, you are just disgusting to him, and he says in his statement, I can no longer get young, beautiful women. All his nieces are grown now. He can't go after them, right. So he gets these dolls, and there is just -- maybe it's a coincidence, or maybe it's not, but the control aspect of that, of being able to have them shut up and not talk back and put them wherever you want them, and pose them like he posed [Doe 5 and Doe 6] on the car, all over his house, maybe it's a coincidence. That's for you to decide."

Defense counsel did not address the dolls in his closing argument, and the prosecutor did not address them in her rebuttal.

21

B.    Analysis

1.    Evidence Code section 352.2

We first address defendant's argument that admitting the sex doll evidence violated Evidence Code section 352.2. That statute requires a trial court, when considering whether evidence in the "form of creative expression" is unduly prejudicial under section 352, to consider that the evidence's probative value is minimal unless certain criteria are satisfied, and that undue prejudice includes the possibility the evidence may be treated as unlawful propensity evidence. (Evid. Code, § 352.2, subd. (a).)

The statute became effective on January 1, 2023. Defendant's trial ended on June 14, 2022. But defendant contends the statute is ameliorative and applies retroactively to nonfinal cases such as his under *In re Estrada* (1965) 63 Cal.2d 740. Under *Estrada*, ameliorative changes to the criminal law apply retroactively to nonfinal cases in the absence of contrary indications by the Legislature. (*Id*. at p. 746; *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 308.)

The Courts of Appeal are presently split on whether Evidence Code section 352.2 is retroactive as an ameliorative change to the criminal law. A panel of this court in *People v. Slaton* (2023) 95 Cal.App.5th 363, 371-376, review granted November 15, 2023, S282047, determined the statute was not an ameliorative change and was not retroactive. The court in *People v. Ramos* (2023) 90 Cal.App.5th 578, 595, review granted July 12, 2003, S280073, reached the same conclusion. The court in *People v. Venable* (2023) 88 Cal.App.5th 445, 448, review granted May 17, 2023, S279081, reached the opposite conclusion.

We agree with the reasoning of our colleagues in *Slaton* that Evidence Code section 352.2 is not an ameliorative change to the criminal law entitled to retroactive application. The statute "does not alter the punishment or other consequences for an offense. It does not, by design or function, reduce the possible punishment for an

22

offense. It does not change the substantive offense or penalty enhancement for any crime. And it is not a statute that, if applied prospectively only, could be said to reflect the Legislature's 'desire for vengeance.' (*Estrada, supra*, 63 Cal.2d at p. 745.) It is instead a new evidentiary rule intended to prevent trial courts from admitting a person's creative expression without first properly evaluating the negative consequences of doing so. And it is a neutral rule at that, limiting a defendant's ability to present a person's creative expression just as much as the prosecution's ability to present this type of evidence. . . . Neutral evidentiary rules of this sort do not warrant *Estrada* treatment." (*Slaton, supra*, 95 Cal.App.5th at pp. 372-373.)

Because Evidence Code section 352.2 is not retroactive, it does not apply to this case.

### 2. Harmless error

Assuming only for purposes of argument that the statute is retroactive and that the trial court erred by admitting the sex doll evidence—points we do not concede—we conclude any such error was harmless. Because the routine application of the state Evidence Code does not implicate a criminal defendant's constitutional rights, we apply the state harmless error standard. (*People v. Jones* (2013) 57 Cal.4th 899, 957; *People v. Bacon* (2010) 50 Cal.4th 1082, 1104, fn. 4.) Under that standard, we determine whether it is reasonably probable that defendant would have obtained a more favorable result had the error not occurred. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) In this context, "probability" means "merely a reasonable chance, more than an abstract possibility." (*People v. Hendrix* (2022) 13 Cal.5th 933, 944.)

We conclude it is not reasonably probable defendant would have obtained a more favorable result had the sex doll evidence not been admitted. Conviction of a sexual assault crime may be based on the testimony of a complaining witness alone. (*People v. Poggi* (1988) 45 Cal.3d 306, 326.) In this case, six different victims testified that

defendant had sexually abused them. They explained when and where the abuse occurred, the circumstances that preceded the abuse, and the abuse itself.

The testimony of Does 1, 2, 3, and 6 of defendant's molestations was admitted as propensity evidence under Evidence Code section 1108 as to the other sex offenses charged in the case. (CALCRIM No. 1191B.) That evidence was compelling evidence that defendant was inclined to commit sexual offenses, and that he committed the offenses charged in this case.

The victims' testimony was corroborated by the expert witnesses. The grooming expert's description of a child molester's grooming matched the actions defendant took with the victims. Defendant stated to the detectives that he liked young, beautiful women and girls, and definitely not middle-aged women or women who had children. He told the detectives that the victims were "all cute girls." As a "guy," he enjoyed their attention and admiration. But he had his preferences. When Doe 5 was 15, defendant turned more of his abuse onto Doe 6, who was younger. Other than Doe 5, none of the victims were older than 14 years when the abuse occurred.

Defendant gained the victims' trust and played a role in their lives. He was the fun, cool uncle who took the victims swimming, boating, shopping, and out to eat. He let them watch movies and "just hav[e] fun." He was affectionate and loving, often holding their hands and kissing them. He would listen to the victims talk about their concerns.

He isolated the victims before molesting them. He tried to make sure they were alone or that others were asleep. He told the victims that what was happening was a secret between them. He initiated sexual contact slowly by such things as showing the victims pornography, rubbing their backs and shoulders, allowing them to tickle him, and asking them to squeeze his nipples.

Defendant also attempted to control the relationship. He asked the victims not to tell anyone about what "we" did. He told one victim that if she disclosed the molestation,

it would ruin her family. Defendant's actions fit the description of grooming as explained by the expert witness.

The CSAAS expert's description of the impact sexual abuse has on its victims corroborated the victims' actions after the abuse occurred, the emotional impact, and their reluctance to testify. In addition to experiencing grooming and secrecy as just discussed, the victims at times found themselves helpless to end the abuse. They felt they could not pull their hands away, or that they had no option but to comply with his demands. Others did not fully understand what was happening.

The victims developed coping strategies to deal with the emotional impact from the abuse. Most of them did not report the abuse right away but waited until they felt comfortable disclosing the essence of the abuse to a trusted friend. Each of the victims exhibited some of the patterns that the CSAAS expert explained were common in victims of sexual abuse.

Defendant argues the evidence was not one-sided. He testified and vigorously denied the allegations, as he had done in the police interview. He asserts the case was "hotly contested" and the prosecution's case was not overwhelming. (See *People v. Paniagua* (2012) 209 Cal.App.4th 499, 520.) The prosecution's case, however, was strong, and the corroborated victim testimonies and propensity evidence was strong enough such that, absent the sex doll evidence, the jury still would have convicted defendant of the charged offenses.

Defendant claims the victims' credibility was weakened because they spoke with each other about their experiences. The victims, however, first disclosed the molestations to others before speaking among themselves. Doe 5 and Doe 6 disclosed the molestations to their mother and to police in Utah. They spoke with California law enforcement before they spoke with the other victims. Doe 1, Doe 2, Doe 3, and Doe 4 first disclosed their molestations to friends. Doe 5 and Doe 6's mother and friends of

Doe 1 and Doe 4 testified of hearing the disclosures. There is no evidence those witnesses had a motive to lie about the disclosures.

Defendant claims the evidence established that the victims' motives were based on the need for money or their knowledge of the animosity between he and his brother Brian. There is no evidence that either of those factors motivated the victims to testify, only defendant's speculation. Some of the victims testified out of a sense of justice. Others did not want to testify at all. Moreover, even though defendant blamed Brian for many of his troubles, he admitted in his testimony that Brian, as the executor of his mother's estate, was paying for his defense. In fact, defendant testified that Brian believed in him.

Defendant contends the victims were "not amply corroborated." There was no independent medical, physical, or percipient witness testimony. When his home was searched, officers found no pornographic magazines, and no child pornography was found on his seized electronic equipment. But none of these matters are prerequisites for convicting someone of sexually abusing a child. Nor are they the only means to corroborate the victims' testimony. Our review for harmless error is based on evidence that was presented to the jury, not on evidence not presented. And we conclude, based on that evidence and defendant's arguments notwithstanding, there was no reasonable probability defendant would have obtained a more favorable outcome had the sex doll evidence not been admitted.

Defendant argues we should review for harmless error under the federal *Chapman*[1] standard because admitting the sex doll evidence violated his due process right to a fundamentally fair trial. The admission of relevant evidence does not violate due process unless the evidence is so prejudicial it renders the defendant's trial

---

[1] *Chapman v. California* (1967) 386 U.S. 18, 24.

fundamentally unfair.  (*People v. Partida* (2005) 37 Cal.4th 428, 439.)  At issue is whether the evidence was "so inflammatory as to prevent a fair trial," a standard that is not identical to the standard of undue prejudice set forth in Evidence Code section 352.  (*Duncan v. Henry* (1995) 513 U.S. 364, 366.)  If the evidence was that inflammatory, we would determine whether the error was harmless beyond a reasonable doubt.  (*Chapman, supra*, 386 U.S. at p. 24.)

The sex doll evidence was not so inflammatory as to prevent a fair trial.  It was no more inflammatory than the evidence of defendant's molestations of the victims.  Defendant, who was from 22 to 37 years older than his victims, molested his six nieces when they were young girls and teens after having groomed them to trust him and gained secluded access to them.  Unlike his acts against the victims, neither possessing the dolls nor having sex with the dolls was illegal.  And, of course, the dolls were not human girls.

Moreover, the doll evidence was not admitted to establish defendant had sex with the dolls and therefore was a child molester.  Rather, defendant's statements about the dolls, his reasons for having them, and his acts of dressing and posing them were admitted for the jury to consider whether to draw a link between those actions and his molestations of the victims.  This evidence did not prevent defendant from having a fair trial.  Thus, his due process rights were not violated, and we will not apply the *Chapman* harmless error standard.

II

*Evidence in Support of Count 1's Asportation Element and Count 2's Kidnap Finding*

Defendant contends that insufficient evidence supports his conviction on count 1 of aggravated kidnapping and the jury's true finding in count 2 of kidnapping for purposes of the one-strike allegation under section 667.61, subdivision (d)(2).  He argues that substantial evidence does not support the jury's finding that his moving Doe 1 from

27

outside his tent to inside his tent and onto his cot, a distance of four feet, constituted sufficient asportation.

A person is guilty of aggravated kidnapping under section 209, subdivision (b), if he "kidnaps or carries away" a child under the age of 14 to commit a lewd act on that child. (§§ 209, subd. (b)(1); 288.) The prosecution must establish that (1) the movement of the victim was beyond that merely incidental to the commission of the intended underlying offense, and (2) the movement increased the risk of harm to the victim over and above that necessarily present in the intended underlying offense. (§ 209, subd. (b)(2).) The increased risk of harm may be of either physical or psychological harm. (*People v. Robertson* (2012) 208 Cal.App.4th 965, 984.)

To apply these interrelated factors, "the jury must 'consider[] the "scope and nature" of the movement,' as well as 'the context of the environment in which the movement occurred.' " (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1151, italics omitted.) "This standard suggests a multifaceted, qualitative evaluation rather than a simple quantitative assessment." (*Id*. at p. 1152.) The jury should consider such factors as "whether the movement decreases the likelihood of detection, increases the danger inherent in a victim's foreseeable attempts to escape, or enhances the attacker's opportunity to commit additional crimes." (*Ibid*.) The appellate court must consider "how all the attendant circumstances relate[] to the ultimate question of increased risk of harm." (*Ibid*.)

Measured distance is a relevant factor, but it "must be considered in context, including the nature of the crime and its environment. In some cases a shorter distance may suffice in the presence of other factors, while in others a longer distance, in the absence of other circumstances, may be found insufficient. For example, moving robbery victims between six and 30 feet within their home or apartment [citations] or 15 feet from the teller area of a bank to its vault [citation] may be viewed as merely incidental to the commission of the robbery and thus insufficient to satisfy the asportation requirement of

aggravated kidnapping. Yet, dragging a store clerk nine feet from the front counter of a store to a small back room for the purpose of raping her [citation] or forcibly moving a robbery victim 40 feet within a parking lot into a car [citation] might, under the circumstances, substantially increase the risk of harm to the victim and thus satisfy the asportation requirement. These examples are illustrative only; each case must be considered in the context of the totality of its circumstances." (*Dominguez, supra*, 39 Cal.4th at p. 1152.)

As an additional example, in *Robertson, supra*, 208 Cal.App.4th 965, the Court of Appeal found that the evidence supported a conviction of aggravated kidnapping to commit rape. The defendant had moved the victim from near an exit door inside the back of a garage used by the defendant as a church, past several rows of pews, and to the front of the garage next to a tub of water where he assaulted her. The court held the movement was more than incidental to the rape and increased the risk of harm to the victim over and above that necessarily present in a rape. (*Id*. at p. 978.) " 'Where a defendant drags a victim to another place, and then attempts a rape, the jury may reasonably infer that the movement was neither part of nor necessary to the rape.' " (*Id*. at p. 984, quoting *People v. Shadden* (2001) 93 Cal.App.4th 164, 169.) The movement increased the victim's risk of harm because it made her vulnerable to attack by concealing her from public view, reduced the possibility she could escape, increased the defendant's ability to foil an escape if she tried, and decreased the likelihood of detection. (*Robertson*, at p. 985.) Also, positioning the victim next to the water tub helped the defendant gain control over her. If she resisted, he could quickly and quietly drown her. (*Ibid*.)

By contrast, in *People v. Perkins* (2016) 5 Cal.App.5th 454, the Court of Appeal found that the evidence did not support aggravated kidnapping and kidnapping enhancement findings. After sodomizing the 11-year-old victim in the apartment's only bathroom, the defendant ordered her to move to the apartment's only bedroom, a distance between 10 and 30 feet, where he sodomized and raped her. (*Id*. at p. 460.) The doors to

both rooms were not closed during the attacks. (*Id.* at p. 470.) In addition to the short distance, no evidence indicated the movement increased the risk of harm to the victim. No evidence established that the movement decreased the likelihood of detection, increased the danger in the victim's foreseeable attempts to escape, or enhanced the defendant's ability to commit additional crimes. (*Ibid.*)

To assess the evidence's sufficiency in the case before us, we review the whole record to determine whether any rational trier of fact could have found beyond a reasonable doubt that defendant's movement of Doe 1 was not merely incidental to the assault and increased the risk of harm to her. " 'The record must disclose substantial evidence to support the [element]—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. . . . "We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" [Citation.] A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)" (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

We conclude that substantial evidence supports the jury's determination that defendant's movement of Doe 1 from outside his tent to inside his tent and to his cot was not merely incidental to the assault, and it increased the risk of harm to Doe 1. Although the distance of four feet is small, when we consider the scope and nature of the movement as well as the context of the environment in which the movement occurred, we find substantial evidence on which the jury could rely to determine the movement was an unlawful asportation.

It was night when the assault occurred, and defendant could have assaulted Doe 1 outside his tent, just as he assaulted her outside her tent another night during that trip. Moving her inside the tent thus was not merely incidental to the assault. Because there were other tents nearby, moving Doe 1 inside decreased the likelihood of detection. It also denied Doe 1 a means to escape, and defendant gained physical control over the situation. Zipping the tent "door" closed gave defendant still greater privacy and, arguably, hindered the victim's ability to escape. These circumstances were consequences of the asportation, not incidental to the assault.

The evidence also shows that defendant put Doe 1 at greater risk of harm by moving her into his tent. The privacy of the tent enhanced defendant's opportunity to commit additional crimes. He accomplished several acts of molestation, including kissing Doe 1 on her ear and neck, touching her breasts, and touching her pubic area. Defendant would have incurred more risk of being detected by others had he attempted these acts while Doe 1 was outside the tent. Moving Doe 1 inside the tent also increased the danger inherent in any attempts by Doe 1 to escape. Indeed, it allowed defendant to prevent her escape and prevent detection by rolling on top of her on the cot and covering her mouth and nose with his hand to keep her quiet.

Defendant argues that the distance of four feet was too short a distance to qualify as asportation. Relying on *Perkins*, defendant asserts that contextual factors do not suffice to establish asportation beyond a reasonable doubt when the movement is only a very short distance. In *Perkins*, however, the distance of 10 to 30 feet between the two rooms was only one factor the court cited to conclude the asportation was insufficient. The court also relied on the lack of contextual factors that would indicate a higher risk to the victim. The doors to both rooms were open during the attacks. The movement did not decrease the likelihood of detection, increase the danger in the victim's foreseeable attempts to escape, or enhance the defendant's ability to commit additional crimes. The

31

defendant was able, and did, commit whatever crimes he desired in both rooms. (*Perkins, supra*, 5 Cal.App.5th at pp. 470-471.)

Here, defendant moved Doe 1 from a public outdoor space into a small, private tent. This asportation significantly increased defendant's ability to commit additional crimes, reduced others' abilities to detect defendant's actions, and increased the risk of harm to Doe 1 if she tried to escape. When a defendant "moves a victim from a public area to a place out of public view, the risk of harm is increased even if the distance is short." (*Shadden, supra*, 93 Cal.App.4th at p. 169.) Substantial evidence thus supports the aggravated kidnapping conviction on count 1 and the kidnapping finding for the one-strike allegation on count 2.

III

*Lack of Instruction on Lesser Included Offense of False Imprisonment*

The trial court did not instruct the jury on the crime of false imprisonment, a lesser included offense of aggravated kidnapping. (*Shadden, supra*, 93 Cal.App.4th at p. 171.) Defendant argues the court erred by not instructing on the offense sua sponte because even if there was substantial evidence to sustain the asportation element in count 1 and the kidnapping finding in count 2, substantial evidence also supported a reasonable inference that the short distance he moved Doe 1 did not sustain the asportation element.

A trial court has a duty to instruct sua sponte on a lesser included offense " 'if there is substantial evidence the defendant is guilty only of the lesser.' [Citation.] Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, but not the greater, offense." (*People v. Shockley* (2013) 58 Cal.4th 400, 403.) The court must instruct on the lesser included offense "only '[w]hen there is substantial evidence that an element of the charged offense is missing, but that the accused is guilty of' the lesser offense." (*Id*. at p. 404.) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser

32

included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (*People v. Breverman* (1998) 19 Cal.4th 142, 162, disapproved on another ground in *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7.)

Assuming for purposes of argument that the trial court erred by not instructing the jury on false imprisonment, we conclude the error was harmless. We review the erroneous failure to instruct on a lesser included offense under the *Watson* standard of prejudice and ask whether there is a reasonable probability defendant would have obtained a better outcome had the error not been committed. (*People v. Campbell* (2020) 51 Cal.App.5th 463, 501.) There was no such reasonable probability. As we explained earlier, the evidence against defendant was compelling. Defendant had a propensity to molest girls and he acted on that propensity against Doe 1 and each of the victims. The victims' testimonies were corroborated by the expert witnesses and by the friends who heard their disclosures. Even had the court instructed on false imprisonment, there is no reasonable probability the jury would have convicted defendant on count 1 of anything other than aggravated kidnapping or would have found the kidnapping finding on count 2 not true.

IV

*Abstract of Judgment*

Defendant points to an error in the abstract of judgment. The abstract lists the sentence on count 10 as a consecutive 15 years to life. When it pronounced sentence on count 10, the trial court imposed a sentence of 15 years to life, but it stayed execution under section 654. The Attorney General further notes that the clerk's minutes incorrectly state (1) the sentence on count 10 was imposed as a consecutive term, and (2) the sentence on count 1 was a consecutive term when the trial court in fact stayed that term under section 654. Because the oral pronouncements control, we will direct the trial

33

court to correct the errors in the abstract and in the minutes.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

DISPOSITION

The judgment is affirmed.  The trial court is directed to prepare a corrected abstract of judgment that records the sentence on count 10 as stayed under section 654, and to forward the corrected abstract to the Department of Corrections and Rehabilitation.  The trial court is also directed to correct its minutes for the sentencing hearing held on June 14, 2022, to state that the sentences on counts 1 and 10 were stayed under section 654.


                               _____

                               HULL, Acting P. J.


We concur:


_____

MAURO, J.


_____

KRAUSE, J.