Filed 12/3/24  P. v. Javonitalla CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D082744 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF2000961) |
| CHRISTOPHER JAVONITALLA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside, Walter H. Kubelun, Judge.  Affirmed.

Jason L. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Warren J. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

Christopher Javonitalla sexually abused his child when she was between the ages of seven and ten years old.  A jury convicted Javonitalla of

seven counts of sexual assault and found true kidnapping enhancement allegations under California's one-strike law, Penal Code section 677.61.[1] The trial court sentenced him to 105 years to life in prison.

On appeal from the judgment of conviction, Javonitalla asserts insufficient evidence supported the jury's true findings on the kidnapping enhancement allegations because his movement of the child from a playroom to the laundry room, bedroom, and office was merely incidental to the underlying crimes. As we shall explain, we reject this argument and conclude the evidence concerning Javonitalla's movement of his child to abuse her was sufficient to support the kidnapping allegations. Javonitalla also asserts the trial court committed reversable error by failing to instruct the jury that his "reputation for truthfulness could be considered in evaluating his" credibility. This argument also lacks merit. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The victim, C.J., was born in 2009 and was 12 years old during the September 2022 trial. At the time of the crimes, C.J. lived with Javonitalla,[2] her mother, and the couple's younger child. Javonitalla was severe in his punishment of C.J., including making her stand for two hours for not eating her breakfast and twice hitting her with a hanger. Once, Javonitalla forced

---

[1]    Subsequent undesignated statutory references are to the Penal Code.

[2]    Javonitalla was not C.J.'s biological father. He met C.J.'s mother and C.J. when C.J. was two years old. After Javonitalla and C.J.'s mother married, Javonitalla adopted C.J. in the summer of 2019.

C.J. to repeatedly make her bed in a military style while he watched from a security camera that was installed in the loft where C.J.'s bed was located.[3]

Javonitalla often watched the children while C.J.'s mother was away from the house. C.J. testified that the first time Javonitalla sexually abused her, she was seven years old. C.J. told the jury she was in her parents' bedroom and Javonitalla took his shorts off, and masturbated with his hand until he ejaculated. C.J. stated this occurred on several other occasions, including in her parents' bedroom and in Javonitalla's office. C.J. testified she wished her sister would have entered the office so that Javonitalla would stop.

C.J. testified that when she was around nine years old, Javonitalla touched her vagina and penetrated it with his finger. C.J. testified that this happened three times. She recalled one of the times was in the laundry room of their home. C.J. also testified that Javonitalla once placed his hand on her thigh while Javonitalla and C.J. were waiting in the car as her mother was shopping.

C.J. also testified that when she was between seven and ten years old, Javonitalla forced her to orally copulate him. In addition, C.J. recounted that Javonitalla forced her to watch videos of sexual conduct, including oral copulation, and he would instruct her that he wanted her to perform the same actions on him. C.J. testified another incident occurred shortly before she told her mother about the abuse, when she was ten years old. C.J. stated there was a power outage at the house, and that while her mother and sister were asleep upstairs, she was downstairs on the couch with Javonitalla and he made her touch his penis. Footage from a security camera that covered

---

[3]    The loft was later converted to a playroom, and C.J. shared a room with her younger sister.

part the room showed C.J.'s head moving back and forth in a manner that suggested abuse, and captured Javonitalla's voice thereafter telling C.J. to get a paper towel.[4]

C.J. also testified that Javonitalla often told her not to tell her mother or sister about the abuse. C.J. stated that she obeyed him because she was afraid. C.J. did write in her diary that she wanted to tell someone about what was happening to her. After the final incident of abuse, on March 12, 2020, C.J. told her mother. C.J. passed her mother a handwritten note while her mother was playing a video game on her computer with Javonitalla, who was playing on another computer in his office. The note stated: "Dad shows me his boy-part most of the time when you are sleeping or out of the house." C.J.'s mother stopped playing the game and called C.J. into an area away from Javonitalla. C.J. told her mother that Javonitalla had touched her in his bedroom, his office, the laundry room, and the living room. C.J.'s mother called the police and took C.J. to the home of a friend who lived close by. C.J.'s mother drove her to the police station later that night.

At the police station, a forensic interviewer spoke with C.J. about the abuse. A video recording of the interview was played for the jury. During the interview, C.J. told the interviewer about the note she wrote to her mother disclosing that Javonitalla showed her his penis. C.J. then described the abuse in greater detail than she was able to at trial.

She told the interviewer Javonitalla made her touch his penis with her tongue on the living room sofa when the power went out at the house. She also said that Javonitalla once called her into his office and had her bring

---

[4] When Javonitalla was on the stand, he explained that the video actually showed C.J. petting the family's dog (who cannot be seen in the footage) and that he instructed her to get a paper towel to clean food residue that he noticed on a video game controller on a nearby table.

water and soap, which he told her to use on his penis. C.J. said he avoided getting his typical lubricating cream, which C.J. told the interviewer he used often during the abuse, because it would wake up her mother. She stated that Javonitalla forced her to rub his penis and masturbated himself while touching her vagina. C.J. said that Javonitalla also forced her to orally copulate him. C.J. told the interviewer that the day of the forensic interview, Javonitalla called C.J. into the laundry room, which she said had no video cameras, then he told her to sit down on the floor, and he masturbated while he touched her and digitally penetrated her vagina.

A forensic nurse practitioner performed a sexual assault exam on C.J. that night. No acute injuries were observed. Investigators also obtained surveillance video from the family's home. C.J.'s mother testified that the family had surveillance cameras both inside and outside of the house. The videos included the one showing C.J.'s head moving and Javonitalla asking her to get a paper towel. C.J. was asked about the video in a follow up forensic interview in September 2020, and she explained that Javonitalla was asking her to grab a napkin to clean up his ejaculate.

The prosecution also presented the testimony of a forensic psychologist with expertise in child sexual assault accommodation syndrome. The psychologist testified that the syndrome is a pattern of behaviors exhibited by children who have been sexually abused that includes secrecy, helplessness, entrapment accommodation, delayed unconvincing disclosure of the abuse, and retraction or recanting.

A friend of Javonitalla's from his time in the Navy and the friend's wife testified as character witnesses in his defense. They both stated that they never noticed Javonitalla being attracted to children, and they never had any questions about his truthfulness. A pathologist testified for the defense that

5

C.J.'s hymen was intact, which was inconsistent with digital penetration of the victim's vagina. On cross-examination, the pathologist conceded she was not opining on whether oral sex or touching of C.J.'s vagina had occurred. Javonitalla testified in his own defense and denied sexually abusing C.J. in any way. He did admit that he struck C.J. with a coat hanger on two occasions.

After the conclusion of the trial, the jury returned its verdict finding Javonitalla guilty of four counts of oral copulation or sexual penetration with a child 10 years or younger (§ 288.7, subd. (b); counts 1–4); and three counts of forcible lewd conduct with a child under 14 (§ 288, subd. (b)(1); counts 5–7) with true findings that he kidnapped the victim under California's one-strike law (§ 667.61, subd. (e)(1); counts 5–7). Thereafter, the trial court sentenced Javonitalla to an aggregate term of 105 years to life, which consisted of consecutive 15-year-to-life terms for each of his seven convictions. Javonitalla filed a timely notice of appeal from the judgment of conviction.

DISCUSSION

I

Javonitalla argues insufficient evidence supported the jury's true findings that he kidnapped C.J. Specifically, he contends his acts of summoning C.J. from one room to another within their home did not constitute kidnapping.

A

*Legal Standards*

" ' "In reviewing the sufficiency of the evidence, we must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found [this] element[ ] of the crime beyond a reasonable doubt." ' [Citation.] "Substantial evidence" is

6

evidence which is ' "reasonable in nature, credible, and of solid value.' " ' "
(*People v. Hoyt* (2020) 8 Cal.5th 892, 949–950.)  "In deciding the sufficiency of
the evidence, a reviewing court resolves neither credibility issues nor
evidentiary conflicts.  [Citation.]  Resolution of conflicts and inconsistencies
in the testimony is the exclusive province of the trier of fact."  (*People v.
Young* (2005) 34 Cal.4th 1149, 1181.)

Javonitalla was convicted of three counts of lewd touching by means of
duress under section 288, subdivision (b)(1), which is punishable by a
determinate sentence of five, eight, or ten years.  The crime, however, can
also be punished under the alternative sentencing scheme of the one-strike
law.  The enhancement provision under which Javonitalla was tried,
section 667.61, subdivision (e)(1), provides for a life sentence if the accused
"kidnapped the victim of the [lewd acts] in violation of sections 207, 209, or
209.5.  (§ 667.61, subds. (a), (b), (c)(4), (e)(1).)  The jury was instructed on
violations of sections 207, subdivision (b), and 288, subdivision (a), but not
sections 209 or 209.5.  Section 207, subdivision (b), states:  "Every person,
who for the purpose of committing any act defined in Section 288, hires,
persuades, entices, decoys, or seduces by false promises, misrepresentations,
or the like, any child under the age of 14 years to go out of this country, state,
or county, or into another part of the same county, is guilty of kidnapping."

"To prove a defendant guilty of kidnapping, the prosecution must
establish that (1) the defendant took, held, or detained another person by
using force or by instilling reasonable fear; (2) using that force or fear, the
defendant moved the other person, or made the other person move a
substantial distance; and (3) the other person did not consent to the
movement."  (*People v. Burney* (2009) 47 Cal.4th 203, 232; § 207, subd. (a).)
"The second element, that the victim be moved a substantial distance, is

7

called the asportation element." (*People v. Perkins* (2016) 5 Cal.App.5th 454, 464 (*Perkins*).) This is the only element of the crime Javonitalla challenges on appeal.

As Javonitalla acknowledges, kidnapping that is "associated with a target offense" under section 667.61 has the same substantial distance requirement as an aggravated kidnapping charge under section 209, subdivision (b).[5] The asportation element for aggravated kidnapping has two

---

[5] The jury was instructed accordingly with CALCRIM 1200. This instruction told the jury:

"The defendant is charged in allegations with kidnapping for the purpose of child molestation in violation of Penal Code section 207(b).

To prove that the defendant is guilty of this crime, the People must prove that:

1. The defendant persuaded, hired, enticed, decoyed or seduced by false promises or misrepresentations, a child younger than 14 years old to go somewhere;

2. When the defendant did so, he intended to commit a lewd or lascivious act on the child;

AND

3. As a result of the defendant's conduct, the child then moved or was moved a substantial distance.

prongs, (1) substantial movement and (2) increased risk of harm: "[A]ggravated kidnapping requires movement of the victim that is not merely incidental to the commission of the underlying crime and that increases the risk of harm to the victim over and above that necessarily present in the underlying crime itself." (*People v. Martinez* (1999) 20 Cal.4th 225, 232 (*Martinez*), overruled on a different ground in *People v. Fontenot* (2019) 8 Cal.5th 57; §§ 209, subd. (b), 209.5.)  "The two prongs of aggravated kidnapping are not distinct, but interrelated, because a trier of fact cannot consider the significance of the victim's changed environment without also considering whether that change resulted in an increase in the risk of harm to the victim." (*Martinez*, at p. 236.)

" '[T]here is no minimum number of feet a defendant must move a victim in order to satisfy the first prong.' " (*Martinez, supra*, 20 Cal.4th at p. 233.)  Rather, "[i]n determining 'whether the movement is merely incidental to the [underlying] crime ... the jury considers the "scope and nature" of the movement.  [Citation.]  This includes the actual distance a

---

*As used here, substantial distance means more than a slight or trivial distance. The movement must have increased the risk of physical or psychological harm to the person beyond that necessarily present in the molestation. In deciding whether the movement was sufficient, consider all the circumstances relating to the movement. Thus, in addition to considering the actual distance moved, you may also consider other factors such as whether the distance the other person was moved was beyond that merely incidental to the commission of child molestation, whether the movement increased the risk of physical or psychological harm, increased the danger of a foreseeable escape attempt, or gave the attacker a greater opportunity to commit additional crimes, or decreased the likelihood of detection.*

(Italics added.)

9

victim is moved.' " (*Ibid*.) "In some cases a shorter distance may suffice in the presence of other factors, while in others a longer distance, in the absence of other circumstances, may be found insufficient." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1152 (*Dominguez*).)

The second, interrelated, prong of asportation " 'refers to whether the movement subjects the victim to a substantial increase in risk of harm above and beyond that inherent in [the underlying crime].  [Citations.]  This includes consideration of such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes.  [Citations.] The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased.' " (*Martinez, supra,* 20 Cal.4th at p. 233.)  "Whether a forced movement of a rape victim ... was merely incidental to the rape, and whether the movement substantially increased the risk of harm to the victim, is difficult to capture in a simple verbal formulation that would apply to all cases.  ...[T]he jury must 'consider[ ] the "*scope and nature*" of the movement,' as well as '*the context of the environment in which the movement occurred.*'  [Citations.]  This standard suggests a multifaceted, qualitative evaluation rather than a simple quantitative assessment." (*Dominguez, supra*, 39 Cal.4th at pp. 1151–1152.)

Since *Martinez* clarified the asportation requirement of aggravated kidnapping, California courts have upheld numerous convictions where a victim was moved only a short distance, particularly where the movement changed the victim's environment—for example, leaving the safety of a family home, or going from a place of public view to the interior of an apartment. (See, e.g., *Dominguez, supra*, 39 Cal.4th at p. 1151 [movement of rape victim 25 feet from road, down an embankment, and out of sight of passing traffic

10

sufficient to support asportation element of kidnapping]; *People v. Nieto* (2021) 62 Cal.App.5th 188, 200) [sufficient evidence of asportation where the minor victim was lured out of her grandmother's house even though no distance was proven]; *People v. Singh* (2019) 42 Cal.App.5th 175, 187–188 [movement of child between 6 and 15 feet off a bus held to be sufficiently substantial]; *People v. Arias* (2011) 193 Cal.App.4th 1428, 1435 [sufficient evidence of asportation where the defendant moved the victim approximately 15 feet "from a public area to the seclusion of his apartment"].) Critically, "[w]here movement changes the victim's environment, it does not have to be great in distance to be substantial." (*People v. Shadden* (2001) 93 Cal.App.4th 164, 169 [movement of nine feet was substantial in case of aggravated kidnapping to commit rape].)

B

*Analysis*

As stated, Javonitalla contends that his movement of C.J. from the home's playroom to his bedroom, his office, and the laundry room was not sufficient evidence of asportation to support the jury's kidnapping enhancement findings. He asserts that affirming the enhancement findings here would result in every instance of "lewd touching automatically receiving a one-strike sentence even though the movement involved is not criminologically significant." In support of his argument, Javonitalla points to a survey conducted by the United States Department of Justice in 2000 that found 77% of child sexual assaults occur in a residence and the testimony of the prosecution's child sexual abuse expert that "90% of the time, [the perpetrator of sexual abuse is] someone known very well to the

11

child, either family or close friends of the family.  Someone that ... has been entrusted with the care of the child."

The Attorney General responds that the jury was properly instructed on the law (a fact not disputed by Javonitalla) and that the jury's findings of asportation were sufficiently supported by Javonitalla's movement of C.J. from the play area to other areas of the house, which decreased the risk of detection and increased Javonitalla's ability to abuse C.J.  The Attorney General points to the evidence that Javonitalla moved the child to an area that was out of view of the home's surveillance cameras and away from her sister and mother, who were often in the house at the times the abuse occurred.

We agree with the Attorney General that the evidence was sufficient to support the jury's findings.  As in cases cited in the prior section, the movement of C.J. "changed [her] environment from a relatively open area," her playroom, "to a place significantly more secluded, substantially decreasing the possibility of detection, escape, or rescue."  (*Dominguez, supra*, 39 Cal.4th at p. 1153.)  Indeed, C.J. herself testified she wished that her sister would have tried to enter Javonitalla's office so that "he would stop" the abuse.  This evidence supported the jury's finding that Javonitalla's movement of C.J. was not trivial or incidental to the crimes.  Rather, the movement facilitated the crimes by allowing Javonitalla to avoid detection, particularly by the surveillance cameras that were installed inside the family's home.

Javonitalla's movement of his daughter into secluded areas of the house, outside the view of the cameras, also distinguishes this case from others where the court has determined the movement at issue was not substantial, and merely incidental to the crimes.  (See *People v. Washington*

12

(2005) 127 Cal.App.4th 290, 299 [holding movement of bank manager and teller from their work locations, about 35 and 45 feet, to the bank's vault was incidental to robbery; "the movement occurred entirely within the premises of the bank and each victim moved the shortest distance between their original location and the vault room. Thus, there was no excess or gratuitous movement of the victims over and above that necessary to obtain the money in the vault"]; and *People v. Hoard* (2002) 103 Cal.App.4th 599, 607 [reversing aggravated kidnapping conviction on asportation element because "forcing the two employees to move about 50 feet to the office at the back of the store," giving "defendant free access to the jewelry and allow[ing] him to conceal the robbery from any entering customers who might have thwarted him[,] ... served only to facilitate the crime with no other apparent purpose"].)

*Perkins*, the published case perhaps most similar to the present one, is distinguishable on the same basis. In *Perkins, supra*, 5 Cal.App.5th at page 459, the defendant sodomized an 11-year-old child, who was the daughter of his ex-wife. The night before the crime, the defendant was staying with the child, her mother, and the two younger children of the mother in the mother's apartment. (*Ibid*.) The defendant and his ex-wife argued through most of the night, and the victim was awoken by the defendant the next morning. (*Id*. at p. 460.) He told her to feed her infant sister, and then when she was finished feeding the baby, to go into the bathroom. (*Ibid*.) He entered after her and proceeded to sodomize and rape her. (*Ibid*.) He then had the child move into the mother's bedroom and committed additional acts of sodomy and rape. (*Ibid*.) The children's mother was not in the apartment at the time of the crimes. (*Ibid*.)

The defendant was convicted by a jury of various crimes of sexual assault of a child and the jury also found true allegations that the crimes

13

committed by the defendant in the bedroom involved both aggravated kidnapping and kidnapping under the one-strike law. (*Perkins, supra*, 5 Cal.App.5th at p. 463.) On appeal, the defendant argued there was no evidence his movement of the child from the bathroom to the bedroom had increased the risk of harm to the victim or increased his ability to commit additional crimes. (*Id*. at p. 464.) The Court of Appeal agreed, concluding there was no evidence showing the movement from the bathroom to the bedroom after the first set of assaults increased the risk of harm to the victim. (*Id*. at p. 470.) Additionally, there was no evidence showing that movement decreased the risk of detection. On this point, the court relied on the fact that there was no evidence the doors to either room were closed during the assaults or that moving the child into the bedroom reduced the visibility of the crimes. (*Ibid*.) The court concluded that the evidence showed the defendant "had the opportunity to commit whatever crime he wanted in both rooms, and he did." (*Ibid*.)

Unlike *Perkins*, here, the jury was presented with evidence that supported its finding that the movement both increased the risk to C.J. and decreased the chance that Javonitalla's crimes would be detected. Specifically, both Javonitalla and C.J.'s mother testified that the house had surveillance cameras inside the playroom. Further, C.J. testified that Javonitalla moved her into areas without the cameras, which decreased the chances that the crimes would be discovered by C.J.'s mother. Likewise, the movement also allowed Javonitalla to continue his pattern of sexually abusing C.J., undetected, increasing the harm to her.

In contrast to *Perkins*, where there was a series of crimes committed in a very short amount of time with the movement of the victim occurring between back-to-back attacks, the crimes at issue here occurred over multiple

14

years. The evidence concerning the location of surveillance cameras (and the location of C.J.'s mother for those assaults that occurred when she was home) in relation to the locations of the crimes, supports an inference that Javonitalla chose to commit the crimes in areas of the home where the chances of detection were lower, which in turn increased the risk of additional assaults against C.J. For these reasons, we reject Javonitalla's contention that insufficient evidence supported the jury's finding that there was substantial movement of C.J. for purposes of the kidnapping enhancements.[6]

## II

Javonitalla also argues the court committed prejudicial error by not instructing the jury, sua sponte, that his "reputation for truthfulness could be considered in evaluating his testimony." The Attorney General responds that any potential error was invited by defense counsel's failure to object, there was in fact no error because the jury was otherwise properly instructed on

---

[6]    Relying on the prevalence of sexual abuse against children by their caretakers, Javonitalla argues that affirming the kidnapping allegations will turn every sexual assault by a parent into a kidnapping. We disagree. The identity of abusers is just one factor a jury considers in determining if substantial movement has occurred. The distinctiveness of this case, particularly Javonitalla's movement of C.J. out of the vicinity of the family's surveillance cameras, uniquely supports the jury's findings. As noted, "[w]hether a forced movement of a rape victim (or intended rape victim) was merely incidental to the rape, and whether the movement substantially increased the risk of harm to the victim, is difficult to capture in a simple verbal formulation that would apply to all cases." (*Dominguez, supra*, 39 Cal.4th at p. 1151.) Rather, each jury in a kidnapping case is tasked with " 'consider[ing] the '*scope and nature' of the movement*,' as well as '*the context of the environment in which the movement occurred*' " in the particular case before it. (*Ibid*.)

assessing witness credibility, and any possible error was harmless. We agree with the Attorney General on all three points.

A

*Additional Background*

Before the jury was instructed, Javonitalla's counsel requested CALCRIM No. 350, which states that reputation evidence can raise a reasonable doubt as to whether the defendant committed the charged crimes. The prosecutor submitted a supplemental brief explaining the parties agreed that the jury should be instructed with CALCRIM No. 350 with respect to Javonitalla's reputation for not having a sexual interest in children, but that the instruction was not available for reputation evidence concerning his character for truthfulness.[7] At the jury instruction conference, Javonitalla's counsel submitted on the issue without additional argument. The court then agreed with the prosecution and denied Javonitalla's requested instruction.

---

[7] The jury was instructed with CALCRIM No. 350 that: "You have heard character testimony that the defendant does not have a sexual interest in children relevant to or has a good reputation for not having sexual interest in children in the community where he lives or works.

Evidence of the defendant's character for not having a sexual interest in children can by itself create a reasonable doubt whether the defendant committed the crimes and allegations charged in Counts 1–7. However, evidence of the defendant's good character may be countered by evidence of his bad character for the same trait. You must decide the meaning and importance of the character evidence.

If the defendant's character for certain traits has not been discussed among those who know him, you may assume that his character for those traits is good.

You may take that testimony into consideration along with all the other evidence in deciding whether the People have proved that the defendant is guilty beyond a reasonable doubt."

16

Instead, the court stated that reputation for credibility was addressed by CALCRIM No. 226, which the parties agreed should be given to the jury.

The jury was instructed with CALCRIM No. 226, which stated:

> "You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have.

> You may believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe.

> In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. Among the factors that you may consider are:

> > How well could the witness see, hear, or otherwise perceive the things about which the witness testified?

> > How well was the witness able to remember and describe what happened?

> > What was the witness's behavior while testifying?

> > Did the witness understand the questions and answer them directly?

> > Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided?

> > What was the witness's attitude about the case or about testifying?

> > Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?

> > How reasonable is the testimony when you consider all the other evidence in the case?

> > Did other evidence prove or disprove any fact about which the witness testified?

> > Did the witness admit to being untruthful?

Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not. People sometimes honestly forget things or make mistakes about what they remember. Also, two people may witness the same event yet see or hear it differently.

If the evidence establishes that a witness's character for truthfulness has not been discussed among the people who know him or her, you may conclude from the lack of discussion that the witness's character for truthfulness is good.

If you do not believe a witness's testimony that he or she no longer remembers something, that testimony is inconsistent with the witness's earlier statement on that subject.

If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says. Or, if you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest."

The instruction, which the parties stipulated should be given to the jury, did not include several suggested factors contained in the form instruction, including: "What is the witness's character for truthfulness." (Judicial Council of California Criminal Jury Instruction 226.) Javonitalla now contends the court's failure to include this language, sua sponte, was error.

B

*Legal Standards*

" '[A]ssertions of instructional error are reviewed de novo.' [Citation.] Whether or not the trial court should have given a 'particular instruction in any particular case entails the resolution of a mixed question of law and fact,' which is 'predominantly legal.' [Citation.] As such, it should be examined without deference." (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 568.) Further, " '[i]n determining whether error has been committed in giving or

18

not giving jury instructions, we must consider the instructions as a whole. We must also assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' " (*People v. Yoder* (1979) 100 Cal.App.3d 333, 338.)

The court has a sua sponte duty to instruct the jury generally on the credibility of witnesses, including a testifying defendant.  (See § 1127 ["The court shall inform the jury in all cases that the jurors are the exclusive judges of all questions of fact submitted to them and of the credibility of the witnesses."]; and *People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 883 [citing § 1127].)  "[M]isdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated" in *People v. Watson* (1956) 46 Cal.2d 818.  (*People v. Larsen* (2012) 205 Cal.App.4th 810, 830.)  Under *Watson*, reversal is required only if it is reasonably probable a more favorable result would have occurred absent the error.  (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1244.)

C

*Analysis*

As an initial matter, Javonitalla's counsel failed to object to the proposed jury instructions, or request the language Javonitalla now complains was erroneously omitted.  Rather, his counsel stipulated to the version of CALCRIM No. 226 that was provided to the jury.  Accordingly, this claim of error is waived.  (*People v. Bolin* (1998) 18 Cal.4th 297, 326.)

Further, we agree with the Attorney General that the omission of an instruction telling the jury to specifically consider Javonitalla's "character for truthfulness" was not error.  The jury was adequately instructed on the question of credibility by the version of CALCRIM No. 226 that was provided.

19

They were instructed that they should consider "anything that reasonably tends to prove or disprove the truth or accuracy of [the witness's] testimony," which would obviously include the defendant's character for truthfulness.

In addition, the jury was instructed that if a "witness's character for truthfulness has not been discussed among the people who know him or her, [the jury could] conclude from the lack of discussion that the witness's character for truthfulness is good." An obvious corollary to this instruction is that if a witness's character for truthfulness is discussed, as it was here by Javonitalla's character witnesses, that evidence could be considered by the jury. The jury was also instructed that "[i]n deciding whether testimony is true and accurate, use your common sense and experience." These instructions adequately informed the jury that the character witness testimony proffered by Javonitalla could be considered in determining his credibility.

Finally, even if the court erroneously omitted the language that the jury could consider Javonitalla's character for truthfulness, the error was harmless. As stated, CALCRIM No. 226 sufficiently informed the jury that Javonitalla's past character for truthfulness was relevant to its credibility determination. As the Attorney General points out, "the court instructed the jury that it could consider if a witness made a past statement that was inconsistent with his or her trial testimony, how reasonable a witness's testimony was when considered in light of the other evidence in the case, whether other evidence proved or disproved any fact about which the witness testified, whether a witness's testimony is inconsistent if he or she no longer remembers something, and that if a witness deliberately lied about something significant the jury could consider not believing anything the witness said." Further, in his closing argument, Javonitalla's counsel

20

emphasized that the jury should conclude C.J. was lying because she did not like Javonitalla as a result of his past harsh punishment of her.

In light of Javonitalla's counsel's arguments and the instructional language provided on witness credibility, the jury was provided with ample information about whether and how to assess the credibility of C.J. and Javonitalla.

## DISPOSITION

The judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

'ROURKE, J.